Earl R. COX and Allieson L. Cox,
Appellants–Plaintiffs,

v.

AMERICAN AGGREGATES CORPORATION; Michael Harmon; William Buck; Gary Wesley; Alan Whitlock and Acetylene Products, Inc., Appellees–Defendants.

No. 30A01–9105–CV–159.

Court of Appeals of Indiana,
First District.

Oct. 28, 1991.

Vernon J. Petri, Vernon J. Petri P.C., Indianapolis, for appellants-plaintiffs. ·

Bruce L. Kamplain, Norris, Choplin & Johnson, Indianapolis, for American Aggregates, Michael Harmon, William Buck, Gary Wesley and Alan Witlock.

James E. Rocap, Jr., Rocap, Witchger & Threlkeld, Indianapolis, for Acetylene Products, Inc.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

 Earl R. Cox ("Cox") and Allieson L. Cox ("Allieson") appeal grants of summary judgment in favor of Acetylene Products, Inc. ("API") and American Aggregates Corporation, Michael Harmon, William Buck, Gary Wesley and Alan Whitlock (collectively referred to as "AAC") in an action for personal injuries resulting from Cox's exposure to toxic chemicals during his employment at AAC. We affirm in part, reverse in part and remand.

## ISSUES [1]

We restate the issues presented for appeal as follows:

---

1. Cox begins the argument section of his brief by stating the issue as "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO AAC," Cox goes on to provide the appropriate standard of review without any citation to the record; however, Cox's argument does not end there. He further divides his issue into various subparts with proper citation to the record. Thus, AAC's contention that Cox waived the sole issue for review is without merit.

AAC also argues that Cox waived any issue as to the grant of summary judgment to Cox's fellow employees, by referring only to appellees AAC and API. AAC overlooks the fact that on page two (2) of Appellant's brief, Cox states that

1. Did the trial court properly grant summary judgment to Cox's employer AAC and co-employees, thus leaving Cox's sole remedy as to those parties within the purview of either Indiana's Worker's Compensation Act[2] or Occupational Diseases Act[3]?

2. Did the trial court properly grant summary judgment to API?

3. Did the trial court properly admit the affidavit of Dr. Alvin Bronstein?

## FACTS

Cox was hired by AAC in February of 1986. Cox initially began work as a laborer. On March 21, 1986 an opening for the welder position at the primary crusher was posted; Cox signed up and was awarded the position as primary welder.[4] During the time Cox was welding, Michael Harmon was the plant manager of AAC's quarry and William Buck, Gary Wesley, and Alan Whitlock were foremen.

In April of 1986, Cox began welding at the primary crusher using Hardalloy 118 welding rods. Cox had not used this type of welding rods prior to his employment with AAC and was unaware of any hazards associated with their use. Cox welded in a confined, poorly ventilated area that was below grade. AAC initially provided Cox with two box fans, which he used primarily for comfort rather than ventilation. In May of 1986, Cox reported to Harmon, Buck, and Wesley that he was experiencing breathing difficulty, coughing, and dizziness problems while welding.

On May 28, 1986, Wesley brought a new box of welding rods to Cox. This new box of rods was in the same type of canister as the welding rods that Cox had used in the past; however, this canister had a label on it. After reading the label, Cox learned that the welding rods were manufactured by Teledyne–McKay and the rods emitted manganese and chromium fumes, which can cause lung damage; thus, adequate ventilation should be used. Cox immediately stopped welding and contacted Wesley asking if the Poison Control Center could be notified. The Poison Control Center was contacted the next day and AAC was informed that Cox needed to be seen at the hospital immediately. On May 30, 1986, Cox visited Dr. Gard, at Methodist Hospital Health Care Center and was instructed not to weld for the next five (5) to seven (7) days.

On June 2, 1986, Harmon called Damien Kotecki at Teledyne–McKay inquiring about the appropriate respirator to use with the Hardalloy 118 welding rods and was told that a passive or an air supplied respirator could be used, depending on the conditions. The next day, Cox also contacted Kotecki. Cox informed Kotecki about the welding conditions, the use of the Hardalloy 118 welding rods and symptoms he was experiencing. Kotecki gave Cox advice similar to that he gave Harmon. In addition, Kotecki drafted a letter to Harmon enclosing a product label, a Material Safety Data Sheet and a Health and Safety Bulletin applicable to the Hardalloy 118 welding rods. The letter also reiterated that a dust respirator capable of handling particles smaller than one (1) micron should be used, either a passive or air supplied respirator was appropriate, and adequate ventilation or exhaust equipment should be provided.

On June 3, 1986, AAC purchased welding fume respirators ("paper masks") manufactured by Minnesota Mining and Manufacturing Company ("3M"). Wesley provided Cox with paper masks for his use when welding; however, Wesley did not provide Cox with the plastic bags the masks were packaged in and that contained warning and instructions on the paper masks' use. Cox used the paper masks, along with the box fans for ventilation, until June 10, 1986. On June 10, 1986, Mine Safety

he will refer to American Aggregates Corporation and his fellow employees collectively as "AAC."

2. IND.CODE § 22–3–2–2 et seq.

3. IND.CODE § 22–3–7–1 et seq.

4. The job of primary welder involves welding on the impact hammers of a stone crushing machine using a hard surface welding rod containing manganese and chromium.

Health Association ("MSHA") inspector, George Lalumondiere, inspected AAC's quarry. Lalumondiere reported that at the primary crusher there was inadequate ventilation, the local exhaust system had been removed, and that Cox was wearing a respirator not approved for welding fumes. The next day, Lalumondiere told Cox that Harmon was ordering parts for an exhaust fan. Thereafter, Cox stopped welding until approximately June 20, 1986.

During approximately the same time that AAC purchased the 3M paper masks, AAC also purchased the Glendale–2022 respirator ("GR–2022") from API. Cox began welding with the GR–2022 in mid-June; at this time Cox also was provided an exhaust fan and a hose. However, Cox continued to experience medical difficulties, and on July 30, 1986, Harmon asked Cox if he would train a replacement welder and take an alternate job.

In the beginning of August, Cox complained to Harmon that the GR–2022 did not fit properly. Harmon then instructed Wesley to take Cox to Orr Safety to purchase yet another respirator. Cox used the third respirator while training his replacement at the primary crusher.

Sometime between September 9, and September 16, 1986 Cox quit welding full-time; however, he still welded at the primary crusher on occasion while training his replacement. On October 22, 1986, Cox was awarded a bid position at AAC as a pit truck operator.

On March 27, 1987, Cox filed a complaint against various defendants, including AAC and API, for damages arising from his welding at the primary crusher. On January 28, 1991, summary judgment was entered for API and on the following day for AAC. It is from these grants of summary judgment Cox now appeals.

### DISCUSSION AND DECISION

■ We review the trial court's entry of summary judgment using the same standard as the trial court: summary judgment is only appropriate when there is no issue of material fact and the moving party is entitled to summary judgment as a matter of law. Ind.Trial Rule 56(C); *Mauller v. City or Columbus* (1990), Ind.App., 552 N.E.2d 500, 502, *trans. denied.* Although the court may not weigh the disputed evidence, *Jarrell v. Monsanto Co.* (1988), Ind. App., 528 N.E.2d 1158, 1161, *trans. denied,* (1990), 555 N.E.2d 453, we do consider the contents of the pleadings, affidavits, and depositions in a light most favorable to the nonmovant. *Progressive Construction and Engineering Co. v. Indiana & Michigan Electric Co.* (1989), Ind., 533 N.E.2d 1279, 1282.

### Issue One

I.C. § 22–3–2–6 provides that the Worker's Compensation Act is the exclusive remedy for an employee against his employer if the employee's personal injury was "by accident," "arising out of employment," and "arising in the course of employment." *Evans v. Yankeetown Dock Corp.* (1986), Ind., 491 N.E.2d 969, 973. Neither Cox nor AAC contest that the injuries sustained by Cox arose out of or during the course of employment. Thus, the dispute is whether Cox's injury was "by accident."

Cox contends that he was intentionally injured by AAC; therefore, his claim against it is an exception to the requirement that his exclusive remedy lies within the Worker's Compensation Act, and summary judgment should not have been granted. Cox cites numerous cases in support of his claim that Indiana recognizes an intentional tort exception to the Act. AAC does not disagree with this general proposition; however, it contends that Cox has failed to provide sufficient factual evidence from which the requisite intent can be inferred. We agree with AAC.

■ A naked allegation of an intentional tort is not enough to avoid the exclusive remedy provision of the Worker's Compensation Act. *Tribbett v. Tay Mor Industries, Inc.* (1984), Ind.App., 471 N.E.2d 332, 333. In *Tribbett,* we upheld the dismissal of the employee's complaint holding that allegations that the employer failed to provide safe tools and safe working conditions were insufficient to support

a claim of intentional tort. *Id.* Likewise, in *Blade v. Anaconda Aluminum Co.* (1983), Ind.App., 452 N.E.2d 1036, although the employee presented sufficient facts to raise an inference that his employer intentionally pursued a course of conduct which jeopardized his safety, we found no facts present to support an inference that his employer intentionally injured him. Similar to the employees in the above-cited cases, Cox has not presented any evidence that AAC intended to injure him.

As we have said before, quoting Dean Prosser, regarding the concept of intent in tort law:

> " '[T]he mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief of [sic] consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a certainty.' "

*Blade*, 452 N.E.2d at 1038. In the case at bar, Cox alleges that AAC, its supervisor, and foremen failed to: 1) advise him of the dangers of using Hardalloy 118 welding rods; 2) provide him with manufacturer warnings; 3) instruct him on the proper use, care and maintenance of respiratory devices and ventilation equipment; 4) take sufficient fume samples; and, 5) maintain adequate ventilation. AAC's conduct, assuming Cox's allegations are true, was not exemplary, but it can at most be characterized as grossly negligent or wanton.

■ Even if we were to assume that AAC had the necessary subjective intent to injure Cox, there must be a nexus of substantial certainty between the employer's conduct and the employee's injury for an intentional tort to occur. *National Can Corp. v. Jovanovich* (1987), Ind.App., 503 N.E.2d 1224, 1233 *trans. denied.* In employee/employer situations, the nexus is usually destroyed because the employee has the ability to choose not to engage in the work assignment. *Id.* Cox had the ability to refuse to continue welding. Cox was aware of the dangers of welding with the Hardalloy 118 welding rods approximately one month after he began welding for AAC; but did not discontinue welding despite the medical problems it was causing. Further, Cox himself testified at his deposition that AAC offered him alternative employment on at least two occasions.

Viewing the evidence in a light most favorable to Cox, we hold that the evidence as a matter of law fails to show either the necessary intent or the direct causative connection necessary for an intentional tort. Thus, Cox's exclusive remedy as to AAC is under Worker's Compensation.[5] Hence, we conclude that the summary judgment granted in favor of AAC, including Cox's supervisor and foremen, was proper.

*Issue Two*

■ Cox contends that summary judgment was improperly granted for API because there is a material question of fact as to whether the GR–2022 is defective and unreasonably dangerous. Cox's claim is based on strict liability which is governed by the Indiana Products Liability Act, IND. CODE § 33–1–1.5–1 et seq. Strict liability in tort is imposed when one sells a product in a defective condition unreasonably dangerous to the user or the consumer. I.C. § 33–1–1.5–3(a). Section 33–1–1.5–2.5 states:

> "(a) A product is in a defective condition under this chapter if, at the time it is conveyed by the seller to another party, it is in a condition:

---

5. AAC argues Cox's remedy is found in the Occupational Diseases Act and that there is no "intentional tort" exception under that Act, citing *Buford v. American Tel. & Tel. Co.* (7th Cir.1989) 881 F.2d 432, 434. Whether Cox's appropriate remedy is under Worker's Compensation or the Occupational Diseases Act we need not decide. In either case, the remedy is exclusive.

(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption."

The requirement that the product be in a defective condition focuses on the product itself; whereas, the requirement that the product be unreasonably dangerous focuses on the reasonable contemplations and expectations of the consumer. *Jarrell,* 528 N.E.2d at 1167. In order for liability to attach under I.C. § 33–1–1.5–3(a), both elements must be present. *Id.*

Cox's strict liability claim is without merit. Cox argues that API knew that the GR–2022 was incapable of protecting against manganese fumes but sold it to AAC despite that knowledge; thus, there is a material question of fact as to whether the GR–2022 was defective and unreasonably dangerous. Cox has not presented any evidence that would lead to an inference the product itself was defective. Cox himself acknowledges that the GR–2022 was not designed or intended to be used to filter manganese fumes. Appellant's Reply Brief at 5. Further, Cox asserts that API advised AAC that it was not aware of a specific respirator that would protect against manganese fumes; Cox's argument is a claim of negligence, not strict liability. Since there is no evidence that the GR–2022 was in and of itself defective, we conclude that summary judgment based on the strict products liability claim was proper.

Next, Cox argues that there exist material questions of fact regarding whether API was negligent in selling the GR–2022 respirator to AAC. A trial court's grant of summary judgment will not be disturbed unless the plaintiff provides factual evidence from which negligence can be inferred. *Ogden Estate v. Decatur County Hospital* (1987), Ind.App., 509 N.E.2d 901, 902 *trans. denied.* In order to prevail in a negligence action, the plaintiff must establish that the defendant breached a duty owed to him that proxi-

mately caused the injury. *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324, 328–329, *trans. denied; Ogden,* 509 N.E.2d at 902.

A duty of care exists when one party assumes such a duty, either gratuitously or voluntarily. *Plan–Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212, 1219. The assumption of a duty creates a special relationship between the parties and a duty to act as a reasonably prudent person. *Id.* Cox contends that API assumed a duty to exercise reasonable care by recommending a respirator to AAC, and it breached that duty when it sold the GR–2022 to AAC. API contends that it did not recommend the GR–2022 to AAC; therefore, it never assumed a duty and was not negligent. API also contends that even assuming it did recommend the GR–2022, there is no evidence that it was dangerous. However, the question is not whether the GR–2022 was dangerous in and of itself; but, whether the GR–2022 was capable of filtering manganese fumes. We agree with Cox that there is evidence from which an inference could be drawn that API recommended and sold the GR–2022 to AAC despite knowledge that it was incapable of performing the task for which it was purchased.

On or about June 5, 1986, AAC took possession of the GR–2022 from API; however, the facts leading up to its actual purchase are unclear. Bruce Edmonds, a former employee of API, stated in his deposition, that an AAC representative called inquiring about a respirator for a gentleman " ... in a pit or something of this nature, pit, tank, something like that, and he was going to be welding and he needed a respirator for this gentleman to protect him from fumes." Record at 2220–21. He alleged, he told AAC's representative " ... that from our suppliers, from what I looked in the catalog there was no respirator in there that specified for manganese rod which the gentleman was using." Record at 2222. However, Edmonds said nothing when AAC picked up the GR–2022. Record at 2235. On the other hand, in Harmon's deposition there is evidence that

AAC went to API because it had knowledge of the Hardalloy 118 welding rods and what they were being used for; and, if AAC had known API had no respirator to eliminate the fumes emitted from the Hardalloy 118 welding rods, it would have gone to another source. Record at 2298–99. Further, David Rider, general manager of API, testified that it was possible API researched and recommended something to AAC. Record at 2112.

If API recommended and sold the GR–2022 knowing AAC wanted a respirator for an employee welding in a confined or semi-confined area welding with Hardalloy 118 welding rods, which emit manganese fumes, then API assumed a duty to use reasonable care in assuring that AAC was sold the proper respirator. Therefore, we conclude that because there are disputes as to the material facts and the inferences to be drawn therefrom regarding negligence, the trial court's grant of summary judgment as to the claim of negligence was improper.

*Issue Three*

█ API contends that Dr. Alvin Bronstein was incompetent to render an expert opinion, and therefore, the trial court erred in refusing to strike his affidavit.[6] We disagree. The trial court has broad discretion in determining the qualifications of an expert and the sufficiency of the foundation for the opinion evidence; the trial court's decision in admitting the opinion evidence will only be reversed for an abuse of discretion. *Summers v. State* (1986), Ind.App., 495 N.E.2d 799, 802.

█ It has been said previously, that to be admissible the subject matter of an expert's testimony must be beyond the understanding of laymen. *See Breese v. State* (1983), Ind.App., 449 N.E.2d 1098, *trans. denied; City of Bloomington v. Holt* (1977), 172 Ind.App. 650, 361 N.E.2d 1211, *trans. denied; Rosenbalm v. Winski* (1975), 165 Ind.App. 378, 332 N.E.2d 249, *trans. denied.* However, in *Summers,* we rejected this traditional test and said that

the proper and modern test is whether the expert has some special knowledge which would assist the trier of fact in understanding the evidence or deciding a factual issue. *Id.* at 803. In this case, Dr. Bronstein's affidavit shows that he is a physician and clinical toxicologist, familiar with the properties of manganese and chromium. This special knowledge not only will assist the trier of fact in understanding evidence but also is beyond the common knowledge of the ordinary person. Thus, whichever test is used, the test is met and the trial court did not abuse its discretion in admitting the affidavit.

█ API also points out that an affidavit in support of a motion for summary judgment must be made upon the personal knowledge of the affiant. *See Lee v. Schroeder* (1988), Ind.App., 529 N.E.2d 349, 352, *trans. denied.* Although this is a correct statement of law, we have said that an expert may utilize hearsay information in forming his opinion. *Rubin,* 550 N.E.2d at 328. Dr. Bronstein in his affidavit states that his opinion is based on medical records, the Teledyne–McKay safety bulletin and data sheet, industrial hygiene samplings, depositions, photographs, and various other materials in the record. Therefore, we conclude that the trial court did not err in considering Dr. Bronstein's affidavit when deciding API's motion for summary judgment.

Affirmed in part, reversed in part, and remanded.

Costs are assessed half against appellant and half against appellee, Acetylene Products, Inc.

BAKER and GARRARD, JJ., concur.

---

6. AAC raises the same argument as API; however, since we affirm AAC's grant of summary

judgment, this issue is irrelevant as to AAC.