**Alta L.P. HURD, and Clifford O. Rawley, Individually and as Representative Plaintiffs for a Class of Those Similarly Situated, Plaintiffs,**

v.

**MONSANTO COMPANY, a Delaware Corporation, and Westinghouse Electric Corporation, a Pennsylvania Corporation, Defendants.**

**No. IP 94–983 C B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 25, 1995.

David S. McCrea, McCrea & McCrea, Bloomington, IN, Michael Warshauer, Burge & Wettermark, Atlanta, GA, Michael Gallagher, Fisher Gallagher & Lewis, Houston, TX, for plaintiffs.

Michael R. Fruehwald, Barnes & Thornburg, Indianapolis, IN, for Monsanto Company.

Joseph B. Carney, Baker & Daniels, Indianapolis, IN, Arvin Maskin, Weil Gotshal & Manges, New York City, for Westinghouse Electric Corp.

## ENTRY

BARKER, Chief Judge.

This matter is before the Court on defendant Westinghouse Electric Corporation's ("Westinghouse") motion to dismiss Counts 6 through 13 of the Second Amended Complaint and defendant Monsanto Company's ("Monsanto") motion to dismiss Count 3 of the Second Amended Complaint. For the reasons set forth below, Westinghouse's motion is granted; Monsanto's motion is denied.

## I. FACTUAL BACKGROUND.

For purposes of defendants' motions to dismiss, the facts alleged in the Complaint are undisputed. This is an action brought by Alta Hurd and Clifford Rawley. Both Hurd and Rawley are long-time employees of Westinghouse Electric Corporation ("Westinghouse"), having worked at Westinghouse's Bloomington, Indiana, manufacturing facility since August, 1965, and July, 1967, respectively. Westinghouse owned and operated the Bloomington facility from 1957 through January 1, 1990. During that period, the facility manufactured, among other things, electrical power capacitors, lightning arrestors, fuse cutouts and reclosers. Between 1958 and 1977, Westinghouse used a polychlorinated biphenyl dielectric fluid ("PCBs") called Inerteen as a component part of its electrical power capacitors. The sole manufacturer of PCBs in the United States during that time was Monsanto.

PCBs are made through a process whereby chlorine is passed through heated liquid biphenyl in the presence of iron filings. PCBs, and their by-products polychlorinated dibenzofurans ("PCDFs") and polychlorinated dibenzodixons ("PCDDs"), are human carcinogens. In response to several studies documenting the potential environmental and human health risks attendant to their use, the federal government banned the manufacture and use of PCBs in the mid 1970's.

During the period that PCB fluids were used in the manufacture of electrical capacitors at the Bloomington plant, both Monsanto and Westinghouse "were aware that PCBs were unreasonably dangerous and likely to cause injury" to persons exposed to them. (Second Amended Complaint, ¶ 10). Despite this knowledge, however, defendants either intentionally withheld information concerning the hazards associated with exposure to PCBs, or affirmatively misrepresented their safety.

Hurd and Rawley were exposed to PCB fluids and fumes from the time they began working for Westinghouse until 1977, the year Westinghouse discontinued their use. Hurd suffers joint pain, skin rashes, high cholesterol, nail fungus, loss of concentration, numbness, sinus and colon problems and endometriosis, all of which she believes were caused by exposure to PCBs. She is also fearful that her health will worsen over time as a result of that exposure. Similarly, Rawley maintains that his joint pain, headaches, sinus and stomach problems are the result of PCBs exposure, and he fears that he may ultimately develop more serious health problems such as cancer.

Plaintiffs originally filed this suit as a class action on June 23, 1994. On July 5, 1994, Plaintiffs amended their complaint as a matter of right pursuant to Rule 15. On August 15, 1994, Westinghouse moved to dismiss. Prior to a ruling on that motion, however, the Court granted Plaintiffs leave to amend their complaint a second time. On October 20, 1994, plaintiffs filed the Second Amended Complaint on their own behalf, and on behalf

of "the more than 3,500 workers exposed to [PCBs] and related toxic compounds at [Westinghouse's] Bloomington, Indiana plant from 1958 to 1977 when PCB capacitors were manufactured." (Second Amended Complaint, ¶ 7).[1] In the Second Amended Complaint, plaintiffs allege fraud, conversion, breach of contract and breach of the collective bargaining agreement, battery, intentional harm and punitive damages claims against Westinghouse. Similarly, Monsanto is being sued for emotional distress, fraud, battery, strict liability and punitive damages. Both plaintiffs seek compensatory damages and costs associated with future medical monitoring. Defendants filed the instant motions on November 11, 1994.

## II. STANDARD OF REVIEW.

For purposes of a motion to dismiss, all the allegations in the complaint "are assumed to be true." *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263 (1972); *Midwest Grinding Company v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992). A plaintiff need not set out in detail the facts upon which a claim is based, but must allege sufficient facts to outline the cause of action. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985). The Court will not dismiss the claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Corcoran v. Chicago Park District*, 875 F.2d 609, 611 (7th Cir.1989) *quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## III. WESTINGHOUSE'S MOTION TO DISMISS.

Plaintiffs have alleged several claims against Westinghouse, including fraud, conversion, common law breach of contract, breach of the collective bargaining agreement, battery, intentional harm and punitive damages. In the instant motion, Westinghouse asserts (1) that the exclusive remedy provisions of the Indiana Workmen's Compensation Act ("the Act" or "WCA") and Occupational Disease Act ("ODA") bar each

of these claims, and (2) that even if some claims survive, plaintiffs have failed to state claims for which relief can be granted for reasons specific to each claim. Each argument will be addressed in turn.

## A. Exclusivity Provisions of the Indiana Workmen's Compensation Act and Occupational Disease Act.

In Indiana, two related statutory schemes compensate individuals who suffer work-related harm. First, the WCA provides compensation for personal injury or death by accident arising out of and in the course of employment. I.C. § 22–3–1–1 *et seq.* (Burns 1992) The second, the ODA, provides compensation for disablement or death by an occupational disease arising out of and in the course of employment. I.C. § 22–3–7–2 (Burns 1992). Although related, the statutes are distinct: whereas the former addresses "personal injur[ies] or death" caused "by accident," § 22–3–2–2, the latter addresses "disablement or death" caused "by an occupational disease." § 22–3–7–2; *see generally Buford v. American Telephone & Telegraph*, 881 F.2d 432, 433–34 (7th Cir. 1989).

Both remedial schemes employ exclusivity provisions, which is to say that the compensation remedy afforded under either act is exclusive of all other remedies for claims falling within the purview of that act. *See* I.C. § 22–3–2–6; I.C. § 22–3–7–6. As this Court noted in *Baker v. Westinghouse*, 830 F.Supp. 1161, 1166 (S.D.Ind.1993), when enacting the WCA and ODA,

> the legislature made a conscientious choice to provide individuals who are injured in the course of their employment with compensation which, though probably less than what they would receive if they prevailed in litigation, is guaranteed. In return for this payment, employers are relieved of burdensome litigation because the remedy under both the Act and the ODA is exclusive.

*See also Evans v. Yankeetown Dock Corp.*, 491 N.E.2d 969, 971 (Ind.1986); *Greene v. Westinghouse Electric Corp.*, 573 N.E.2d 452,

---

1. The Court denied plaintiffs' motion for class certification on September 14, 1995.

453–54 (Ind.App.1991). Both statutory schemes thus represent a *"quid pro quo* in which the sacrifices and gains of employees and employers are to some extent put in balance." 2 Larson's Workmen's Compensation, § 65.10 (1995), *quoted in Evans,* 491 N.E.2d at 971.

### (1). Applicability of the ODA

■ A claim falls within the purview of the ODA's exclusive remedy provisions if the employee has suffered (1) an occupational disease and (2) disablement or death. I.C. § 22–3–7–6; *House v. D.P.D., Inc.,* 519 N.E.2d 1274, 1275 (Ind.App.1988).[2]

■ By definition, an occupational disease is a disease "arising out of and in the course of employment." I.C. 22–3–7–10(a). As the Indiana Supreme Court recently made clear, the occupational disease requirement "is designed to reinforce and explain ... that there be a causal connection between any disablement or death suffered and the employment." *Baker v. Westinghouse Electric Corp.,* 637 N.E.2d 1271, 1277 (Ind. 1994). "This causation requirement exists independent of the circumstances by which any given pathogen came to be present in the workplace, including the fact that it was intentionally introduced." *Id.* Accordingly,

> where an employee's disease *was in fact* caused by exposure to the hazards actually posed by a given employment situation, this requirement has been satisfied. This is so even where the employer knows to a certainty that disease will eventually result from a hazard....

*Id.* (citations omitted); *see also Buford,* 881 F.2d at 434–36.

■ The "disablement" requirement refers to an employee's loss of wage-earning ability. *See Spaulding v. Int'l Bakers Services,* 550 N.E.2d 307, 308–310 (Ind.1990).

The ODA defines disablement to mean "the event of becoming disabled from earning full wages at the work in which the employee was engaged when last exposed to the hazards of the occupational disease by the employer from whom he claims compensation or equal wages in other suitable employment." I.C. § 22–3–7–9(e). Thus, if an employee's capacity to earn wages is not affected, then there simply is no disablement. *Zike v. Onkyo Manufacturing, Inc.,* 622 N.E.2d 1055, 1058 (Ind.App.1993) (court remands claim to Worker's Compensation Board for determination on whether claimant "could earn equal wages in other suitable employment which she was capable of performing").

■ Here plaintiffs argue that because their "claims are based on the intentional chemical poisoning by Westinghouse—the exposure to PCBs," the occupational disease element is not satisfied. (Plaintiffs' Brief in Opposition, p. 7). However, as we discussed above, there can be little doubt "that the [Indiana State] legislature viewed the occupational diseases scheme as the only forum in which those injuries, intentionally inflicted or not, might be compensated." *Baker,* 637 N.E.2d at 1276.[3] Nevertheless, we note that plaintiffs are still employed at the Bloomington facility and apparently have not experienced a loss in wage-earning ability. As a result, the Court cannot say, at least at this early stage, that plaintiffs are "disabled" as that term is defined in the statute. Accordingly, their claims cannot be dismissed pursuant to the ODA.

### (2). Applicability of the WCA

■ Similar to the ODA, the WCA establishes worker's compensation as the exclusive remedy for employment-related personal injury or death. Indiana courts have held

---

**2.** The exclusive remedy provision of the ODA states in pertinent part:

> The rights and remedies granted under this chapter to an employee subject to this chapter on account of disablement or death by occupational disease arising out of and in the course of the employment shall exclude all other rights and remedies of such employee....

I.C. § 22–3–7–6.

**3.** Nor do we feel that plaintiffs' claims can in any way be construed as falling within the "violent crime" exception to the ODA. *See Baker v. Westinghouse Electrical Corp.,* 830 F.Supp. 1161, 1165 (S.D.Ind.1993) ("Although they urge the Court to view their alleged exposure to PCBs as a 'violent crime,' this judge is unable to perform such a semantic somersault as it would require the Court to ignore the plain meaning of that term").

that a claim falls within the Act's purview only if it is for (1) a personal injury or death (2) arising out of employment and (3) in the course of employment. *House*, 519 N.E.2d at 1275. Unlike the occupational disease scheme, however, the exclusivity provision of the WCA is limited to personal injuries which occur "by accident." I.C. § 22–3–2–6.[4]

In *Baker*, 637 N.E.2d at 1274–75, the Indiana Supreme Court interpreted the "by accident" language as exempting certain intentional torts from the coverage of the Act. The court made clear, however, that in order to escape the Act's coverage a plaintiff must allege more than just a commonplace intentional tort. Rather, the employee must allege that the employer[5] either deliberately intended to inflict an injury or has actual knowledge that an injury was certain to occur. *See also Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1287 (Ind.1994).

Here, plaintiffs seize on the "by accident" language and argue that "a cause of action based on an intentional tort does not fall under the preview *[sic]* of the Worker's Compensation Act." (Plaintiffs' Brief in Opposition, at 5). As stated above, however, only those intentional torts where the employer intends to inflict an injury or has actual knowledge that an injury is certain to occur fall outside the Act's scope. Thus, this argument is unavailing. *See also Brown v. Westinghouse Electric Corp.*, 803 S.W.2d 610, 616 (Mo.App.1990) ("A naked allegation of an intentional tort is not adequate to permit a claimant to avoid the exclusive remedy provision of the Indiana Worker's Compensation Act"); *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 683 (Ind.App.1991) (same).

Moreover, although plaintiffs make conclusory allegations that Westinghouse withheld information from its employees "knowing that injury was certain to oc-

cur," (Complaint, ¶ 14), those allegations are countered by the facts alleged in the complaint, which state that injuries from PCBs are "likely" and that exposure to PCBs only increases the "*risks* associated with labor in a manufacturing plant." (Complaint, ¶¶ 10, 14; emphasis added). "A complaint, to survive a motion to dismiss, must do more than merely allege intentional injury as an exception to the general exclusiveness rule; it must allege *facts* that add up to a deliberate intent to bring about injury." 2 Larson's Workmen's Compensation, § 68.14 (1995) ((emphasis in original) (footnote omitted).[6] By definition, deliberate exposure to a chemical agent that is merely "likely" to cause harm or increase the "risks" of subsequent illnesses falls short of knowing that injury was certain to occur. Indeed, the *Baker* Court explicitly rejected a more lenient standard that would have allowed private tort actions where an employer knew that exposure to a chemical *could* cause harm: "We also decline to adopt the rule pioneered in Michigan that an employer may be sued in tort if it 'knew that the injury was substantially certain to occur.'" *Baker*, 637 N.E.2d at 1275, n. 5 (citations omitted).

In sum, plaintiffs have failed to allege facts that could show either that Westinghouse utilized PCBs in its manufacturing processes with the intent of injuring their employees, or that it had actual knowledge that injury was certain to occur to its employees due to PCBs exposure. *Foshee v. Shoney's, Inc.*, 637 N.E.2d 1277, 1281 (Ind.1994) (because plaintiff did not aver that her "injury was the *intended product*" of the employer's policy, her allegation that her injuries were "imminently likely" to occur did not fall outside the WCA) (emphasis in original); *Tribbett v. Tay Mor Industries, Inc.*, 471 N.E.2d 332, 333 (Ind.App.1984) (employer must "intentionally

---

**4.** That provision reads in pertinent part:
The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee....
I.C. § 22–3–2–6.

**5.** The Court specifically held that "it must be the employer who harbors the intent and not merely

a supervisor, manager or foreman." *Baker*, 637 N.E.2d at 1275 (footnote omitted).

**6.** *See also Thomas v. Farley*, 31 F.3d 557, 558–59 (7th Cir.1994) (plaintiff failed to state claim for which relief could be granted where conclusory allegations in the complaint were inconsistent with the facts alleged in the complaint);

create[ ] unsafe working conditions *toward the end* that the [employee] be injured" to fall outside WCA) (emphasis in original).[7] As a result, they cannot maintain claims, however labeled, for personal injuries arising out of and in the course of the employment relationship. Accordingly, the following claims are dismissed: battery (Count 10), intentional harm (Count 11), and fraud (Count 6) to the extent that claim seeks damages for personal injuries sustained due to exposure to PCBs.

This is not to say, however, that plaintiffs' claims alleging *economic* injuries are automatically barred by the WCA as well. According to plaintiffs, a careful reading of the Complaint shows that plaintiffs have alleged breach of contract, fraud and conversion claims that rely on an alternative theory of harm; namely, that as a result of Westinghouse's concealment of the actual health risks associated with PCBs, plaintiffs accepted artificially low wages that did not reflect the true level of occupational risk they faced.

Whether claims not sounding in traditional negligence are subject to the WCA's exclusive remedy is not always an easy determination. Generally speaking, where an employee's claims, however styled, seek redress for physical injuries which would have formed the basis of a claim under the WCA, they are barred. This Court, for example, has disallowed private fraud actions where the plaintiff essentially sought compensation for employment-related personal injuries:

> Allowing a fraud action to proceed when it is based on exactly the same injuries which would have formed the basis of a claim under [the WCA] would defeat the legislative purpose which propelled [its] enactment. In short, it would provide too large an avenue for plaintiffs to stage an "end run" around the Act's ... exclusivity provisions.

*Baker v. Westinghouse Electric Corp.*, 830 F.Supp. 1161, 1166 (S.D.Ind.1993). To be sure, the battery, intentional harm and fraud counts dismissed above fall into this catego-

ry. *See, e.g., Building & Construction Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1493 (10th Cir.1993) ("claim for medical monitoring falls under the 'personal injury' umbrella" and thus within Colorado WCA); *Thomas v. Nat'l Semiconductor, Inc.*, 827 F.Supp. 1550, 1553 (D.Utah 1993) (court finds Utah WCA bars claims for breach of contract because their factual basis would require proof of physical and/or mental injury); *Johnson v. Hames Contracting, Inc.*, 208 Ga.App. 664, 431 S.E.2d 455, 458 (1993) (claims that "inextricably and essentially seek redress based on the potential for current or future physical injury due to occupational disease or otherwise ... are barred by" Georgia WCA).

■ Where, however, the claims seek to redress harm distinct from the underlying personal injury, the inquiry is much less clear. For example, in *Baker v. American States Insurance Co.*, 428 N.E.2d 1342, 1346 (Ind.App.1981), the Indiana Court of Appeals held that an employee's fraud claim against a workmen's compensation insurance carrier did not fall within the purview of the Act. Of significance to the court was the fact that the plaintiff was not seeking to recover damages for his underlying personal injury, but instead for harm suffered as a result of fraudulent misrepresentations made by adjusters in an attempt to induce him to settle his claim. In *Greene v. Westinghouse Electric Corp.*, 573 N.E.2d 452, 455 (Ind.App.1991), however, that same court concluded that a loss of consortium claim was barred by WCA "even though the loss of consortium action [sought] recovery for harm distinct from the underlying personal injury." In that case, the court found dispositive the argument that a loss of consortium action would frustrate the purpose of the Act by injecting questions of fault into the proceedings and "disguis[ing] the wolf of suits for employees' injuries in the sheep's clothing of spouses' loss of consortium claims." *Id.* at 455 (internal quotation marks omitted).

Aside from *Baker* and *Greene*, Indiana courts apparently have not examined wheth-

---

7. *See also Coffey v. Foamex L.P.*, 2 F.3d 157, 157 (6th Cir.1993) ("Cases in which an employer 'knowingly permit[s] a hazardous work condition to exist [or] knowingly order[s] claimant to per-

form an extremely dangerous job ... fall[ ] short of the kind of *actual intention* to injure that robs the injury of accidental character' ") (emphasis in original) (citations omitted).

er claims seeking to recover for purely economic harm are barred by the WCA. Despite this lack of caselaw, we think that the Indiana Supreme Court would preclude such claims where, as here, they essentially arise out of employment-related personal injuries. In this case, while it is true that plaintiffs seek to remedy an economic harm distinct from the underlying personal injury, that economic harm undeniably originates from and arises out of the health risks and effects associated with plaintiffs' exposure to PCBs. Given the ease with which almost any personal injury claim could be camouflaged as a claim for higher wages or hazard pay, to allow such private suits would seem to "disguise the wolf of suits for employees' injuries in the sheep's clothing of" contract and fraud actions. *Id.* (internal quotation marks omitted). In short, whether courts like it or not, the all-inclusive character of the exclusiveness principle embodied in the Indiana WCA "turns away from recognizing the distinct nature of harm[s]," and "[i]n so doing . . . fails to compensate for all harms flowing from workplace injuries." *Greene,* 573 N.E.2d at 456. Accordingly, Counts 6 (fraud), 7 (conversion), 8 (common law breach of contract) and 13 (breach of collective bargaining agreement) are dismissed.

### B. Failure to State a § 301 Claim and Preemption under the Labor Management Relations Act (LMRA).

Even if plaintiffs' alternative claims are not barred by the WCA, they are fundamentally flawed in a different respect. It is a well settled rule of labor law that an employee must attempt to exhaust his available grievance procedures before seeking relief from the federal courts for violations of a collective bargaining agreement. *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983); *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1478 (7th Cir.1985). To escape this requirement, plaintiffs must establish either that the union breached its duty of fair representation, *Smith v. Colgate–Palmolive Co.,* 943 F.2d 764, 771 (7th Cir.1991), or that the employer repudiated those contractual procedures, *Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967), or

that resort to the grievance procedures provided would be wholly futile. *D'Amato,* 760 F.2d at 1488.

In this case, plaintiffs do not dispute that the collective bargaining agreement operating between Westinghouse and Local 2031 of the International Brotherhood of Electrical Workers contained a mandatory grievance procedure. Nor do plaintiffs allege that they exhausted the collective bargaining agreement's grievance procedures, or that the union breached its duty of fair representation. Rather, they seek to avoid the consequences of the exhaustion rule by claiming (1) that Westinghouse repudiated the grievance procedures and (2) that resort to those procedures would have been futile.

First, an employee may bypass the grievance and arbitration procedures outlined in a CBA when the conduct of the employer amounts to a repudiation of the grievance procedures. "[T]here must be an anticipatory rejection of the arbitration clause; a failure to implement the (other side's version of the) substantive provisions of the agreement is not enough." *Bailey v. Bicknell Minerals, Inc.,* 819 F.2d 690, 692 (7th Cir.1987). Here, plaintiffs merely argue in their Brief in Opposition that Westinghouse's denial of the dangers posed by PCBs exposure "acted as a repudiation of the contract." (Plaintiffs' Brief in Opposition, at 24). However, to deny that PCBs pose health risks is not a repudiation of the three-step grievance procedure outlined in the CBA. Thus, because plaintiffs failed to allege either that Westinghouse said "it would refuse to arbitrate," *Id.,* or that Westinghouse took steps to frustrate the processing of their grievance, the repudiation exception does not apply. To be sure, to find otherwise "would allow the complainant to bypass [the grievance procedure simply] because the other side's failure to do as the complainant wishes 'repudiates' the agreement." *Id.*

Second, plaintiffs argue that resort to the grievance procedures outlined in the CBA would have been futile. The futility exception applies "in situations where attempts to exhaust contractual remedies have been made and failed." *Munie v. Stag Brew-*

*ery,* 751 F.Supp. 142, 145 (S.D.Ill.1990). Plaintiffs, however, "never sought to invoke the grievance procedure to test [their] futility theory." *Hiner v. BDP Co.,* 716 F.Supp. 1152, 1156 (S.D.Ind.1989). As a result, that exception is also inapplicable.

In response, plaintiffs contend that "[i]n 1993, by the time Plaintiffs were aware of any grievable offense relative to the CBA, the contract specifying the grievance procedure had been expired for two years." (Plaintiffs' Brief in Opposition, at 25). That plaintiffs were unaware of the risks associated with exposure to PCBs until 1993, however, appears nowhere in the Complaint. *See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984) ("it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"). Moreover, the Second Amended Complaint states that plaintiffs "knew that they were exposed to PCBs by the late 1970's," (Second Amended Complaint, ¶ 15), and this Court determined in a prior action that Bloomington plant employees had notice of the risks associated with PCB exposure as of October, 1990, when the National Institute for Occupational Safety & Health announced a statistical association between PCB exposure and increased incidence of death at that specific facility. *Baker,* 830 F.Supp. at 1168.[8] Thus, plaintiffs had over six months in which to initiate the grievance procedure before expiration of the CBA.

In sum, because plaintiffs alleged neither that they sought to invoke administrative remedies, nor that the CBA expired before they became aware of the health risks associated with PCBs, their § 301 claim (Count 13) must be dismissed. Moreover, "[a]ll of Plaintiffs' causes of action against Defendant for fraud [Count 6] and [common law] breach of contract [Count 8] arise out of the CBA." (Plaintiffs' Brief in Opposition, at 13). As a result, they are preempted under § 301 and, accordingly, must fall with Count 13 for failure to exhaust contractual remedies. *See Smith,* 943 F.2d at 768 ("to prevent clever litigants from evading § 301's broad preemp-

tive force by recasting contract claims as claims brought under state tort law, § 301 preempts tort claims as well [as state law breach of contract claims], so long as the claim is one in which 'state tort law purports to define the meaning of the contract relationship' "). Finally, plaintiffs' conversion claim [Count 7], which seeks recovery of the so-called hazard pay differential, would also require interpretation of the CBA's several provisions regarding wages and safety. (Second Amended Complaint, Exh. 3). Thus, it too is preempted by § 301 and must be dismissed.

### C. Punitive Damage and Joint and Several Liability Counts.

Finally, because Counts 9 (punitive damages) and 12 (joint and several liability) are not recognized by Indiana courts as independent causes of action, but rather are derivative of a finding of actual liability, they are dismissed. *See Grimes v. Jones,* 567 N.E.2d 858, 860 (Ind.App.1991).

### IV. MONSANTO'S MOTION TO DISMISS.

Defendant Monsanto has moved to dismiss Count 3 of the Second Amended Complaint for failure to allege fraud with particularity. Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud ... be stated with particularity." This rule, however, must be read in conjunction with the general requirements of Rule 8(a), which states that a plaintiff need only plead a "short and plain statement of the claim showing that the pleader is entitled to relief." Taken together, a plaintiff alleging fraud must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992); *Bankers Trust Co. v. Old Republic Insurance Co.,* 959 F.2d 677, 683 (7th Cir.1992).

---

8. Significantly, district courts can properly consider documents filed in a different case without converting a 12(b)(6) motion into a motion for summary judgment. *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994).

Here, plaintiffs allege that Monsanto knew that PCBs were dangerous and that it affirmatively and continuously misrepresented to the public and Westinghouse's Bloomington employees that PCBs were safe. Plaintiffs also allege that Monsanto represented "that no worker exposed to PCBs from the 1930's to the 1970's suffered any adverse health effects," when in fact such representations were false. (Second Amended Complaint, ¶ 10; *see also* ¶ 32). Finally, the Complaint alleges that plaintiffs relied on these misrepresentations, all of which Monsanto knew to be false.

Although general, these allegations are (just barely) sufficient to satisfy Rule 9(b)'s requirements in this case. The time period involved and the content of the misrepresentations are identified.[9] Although no specific person is identified, we note that courts are "more lenient in sustaining pleadings where [as here] the transactions involved are complex or cover a long period of time." *In re Eli Lilly & Co., Prozac Products Liability Litigation*, 789 F.Supp. 1448, 1456 (S.D.Ind. 1992); *see also Terrell v. Childers*, 836 F.Supp. 468, 475 (N.D.Ill.1993). In short, despite its protestations to the contrary, Monsanto is simply not left guessing about the general nature of the alleged fraud and it has enough information to answer the allegations. *See Levine v. Prudential Bache Properties, Inc.*, 855 F.Supp. 924, 931 (N.D.Ill. 1994). Accordingly, Monsanto's motion to dismiss is denied.[10]

## V. CONCLUSION.

Because the Indiana WCA is the exclusive remedy for injuries arising out of and in the course of employment, Counts 6, 7, 8, 10, 11 and 13 are dismissed. Counts 6 (to the extent it seeks to recover for economic harm), 8, 10 and 13 are dismissed in the alternative for failure to state a claim under § 301 of the LMRA. Because Counts 9 and 12 are dependent upon an actual finding of liability, they too are dismissed. Finally, we note that because this is plaintiffs' third bite at the apple, the dismissals are with prejudice. Indeed, the Court allowed plaintiffs to file the Second Amended Complaint with motions nearly identical to the instant motions already in hand. Their repeated failure to cure the complaint's many deficiencies thus highlights the futility of allowing further amendments.[11] Accordingly, Westinghouse's motion to dismiss is GRANTED. Monsanto's motion to dismiss is DENIED.

It is so ORDERED.

---

9. Although Monsanto spills much ink arguing that it cannot be held liable for a fraudulent omission under Indiana law, we note that all Rule 9(b) requires is that plaintiffs "set forth the date and content of the statements or omissions that it claimed to be fraudulent. [They are] not required to go further and allege the facts necessary to show that the alleged fraud was actionable." *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 522 (7th Cir.1993).

10. On January 24, 1995, plaintiffs filed a "Response" to Monsanto's reply brief without first seeking leave of court. Because the filing of a surreply brief in such a manner violates Local Rule 7.1, the Court sustains Monsanto's objection to its filing. Accordingly, the Court will not and has not consulted that brief in ruling on the present motion.

11. However, for purposes of clarity, no partial judgment is entered at this time pursuant to Rule 54(b).