Kimberly S. VAN JELGERHUIS, Janice L. Brooks, and Kathy L. Page–Nowlin, Plaintiffs,

v.

MERCURY FINANCE COMPANY and Jim Johnson, Defendants.

No. IP 95–0275–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 19, 1996.

**1350**

David W. Gray, Lewis & Kappes, Indianapolis, IN, for Plaintiffs.

Harry L. Gonso, Ice Miller Donadio & Ryan, Indianapolis, IN, Eugene Kelley, Jr., Arnestein & Lehr, Chicago, IL, for Defendants.

**ENTRY DISCUSSING PARTIAL GRANT OF SUMMARY JUDGMENT**

BARKER, Chief Judge.

Plaintiffs, Kimberly Van Jelgerhuis ("Van Jelgerhuis"), Janice Brooks ("Brooks") and Kathy Page–Nowlin ("Nowlin") have sued Defendants, Mercury Finance Company of Indiana, Inc. ("Mercury") and their former supervisor, Jim Johnson ("Johnson"), for sexual harassment in the form of disparate impact, disparate treatment and hostile work environment claims, as well as for invasion of privacy and intentional infliction of emotional distress. Defendants have moved for summary judgment. For the reasons discussed below, this motion is granted in part and denied in part.

## I. STATEMENT OF FACTS

Plaintiffs worked in the Southside Branch of Mercury, an installment contracts purchasing corporation, where Johnson was the regional supervisor. It is undisputed that at all times during plaintiffs' employment, Mercury had a published policy against sexual harassment. That policy states:

> It is the policy of the Company that sexual harassment of employees in the workplace is unacceptable and will not be tolerated. Appropriate management and supervisory personnel shall take prompt, corrective action when they become aware of sexual harassment. Any employee who feels that they have been the victim of sexual harassment should notify their supervisor or the Director of Human Resources. All such matters will be handled on a strictly confidential basis.

Defendants' Ex. F. In addition, on May 31, 1994, a memorandum was issued to all Mercury employees stating:

> In an effort to foster an honorable work environment [at Mercury], we want to offer employees every opportunity to voice their concerns and/or questions regarding moral, ethical or legal business issues. As a result, we have created the *MFC EMPLOYEE HOTLINE* which is a 24 hour toll-free phone number that enables employees to confidentially and anonymously, if desired, address any questionable activities that may occur in the branches ... [T]he MFC Employee Hotline provides an alternative in instances where employees prefer to voice their concerns outside normal management channels. By ensuring that all business activities are in compliance with our policies and the law, we are able to maintain an environment of integrity and respect. We hope that this confidential "1–800" number will free all employees from worrying about any issues that may affect their professionalism, business/peer relationships or application of policy.

Plaintiffs' Ex. G (emphasis in original). The memorandum was signed by the President of Mercury. *Id.*

The picture of the work environment at Mercury's Southside branch as painted by the plaintiffs is hardly a pleasant one. Johnson allegedly mistreated a number of the staff there, men as well as women. However, all three plaintiffs allege that Johnson specifically harassed them on the basis of their sex.

*Van Jelgerhuis' Claims:*

According to Van Jelgerhuis, around February 9, 1993:

> Jim Johnson stated that in his dream, we had made a bet that if I lost weight, he would 'eat me out.' He said that in his dream, I had come into the office and was wearing a short skirt with no underwear and jumped up on his desk and said 'O.K. I win, now eat me out.'

Plaintiffs' Ex. B at 3(a); Van Jelgerhuis Dep. at 252–58. A few months later, Johnson described another dream to Van Jelgerhuis, after first thanking her for "last night":

> I . . . asked him what he was talking about. He then said that he had a dream about me and in his dream, I was sitting at my desk without a shirt or bra. He said that in his dream, he came in and started sucking on my right breast and said 'Boy, was it sweet.' After he said this, I became embarrassed and started to walk away from him and out of his office when he said, 'Who are you going to tell? my wife? your husband?'

Plaintiffs' Ex. B at 3(a); Van Jelgerhuis Dep. at 263–65. In addition to his dream reports to Van Jelgerhuis, Johnson often made comments about Van Jelgerhuis' physical appearance making numerous references to her "fat ass" and the size of her breasts. Plaintiffs' Ex. B at 3(a); Van Jelgerhuis Dep. at 149. Johnson allegedly inquired why her husband would stay with her, given that Van Jelgerhuis was, supposedly, so fat. Plaintiffs' Ex. B at 3(a). In addition, Johnson would comment on Van Jelgerhuis' clothes and demeanor, and, on at least one occasion, Johnson allegedly implied that Van Jelgerhuis looked like a "hooker working at a truck stop." Van Jelgerhuis Dep. at 271. Van Jelgerhuis also saw Johnson make sexually harassing comments about other women in the office as well during her employment there. *See, e.g.,* Van Jelgerhuis Dep. at 216 ("I've seen Jim Johnson stand in his office and holler about the girl's chest in the front of the office."). And, she maintains that there were additional incidents of harassment by Johnson. Van Jelgerhuis at 277 ("Oh, I'm sure that there's lots more than we haven't even begin [sic] to get into."). As a result of Johnson's harassment, Van Jelgerhuis testified that she had to be prescribed antidepressant drugs to alleviate a nervous condition. Van Jelgerhuis Dep. at 285.

According to Van Jelgerhuis, she informed Larry Markle, Johnson's counterpart at Mercury's Anderson Branch, of the February 1993 Johnson dream incident. Van Jelgerhuis Dep. at 153. Van Jelgerhuis maintains that on two different occasions she also spoke about the problems with Johnson with Joe Carson. Van Jelgerhuis Dep. at 151–52, 164. Carson, a subordinate of Johnson's at the Southside Branch, was the Branch Operations Manager as well as Van Jelgerhuis' direct supervisor. Van Jelgerhuis at 162. Van Jelgerhuis also maintains that she attached an anonymous letter to a Mercury workplace survey distributed by Mercury's president, John Brincat. Van Jelgerhuis Dep. at 144. Although the letter identified neither Van Jelgerhuis nor her branch, it apparently described in fairly specific terms the work environment its author endured. Van Jelgerhuis Dep. at 148–50 (describing letter's contents as including accounts of Johnson's behavior in the office as well as recommendation that "someone investigate the office" because the work environment was insufferable). Van Jelgerhuis maintains that the letter was three-pages long. Van Jelgerhuis at 150.

The only response that Van Jelgerhuis ever received from Mercury regarding her complaints came from Joe Carson:

> What do you want me to do[?] If I say it to him [Johnson], he's going to ride you harder. . . . If I don't say anything you're going to be upset. . . . What do you expect me to do about it?

Van Jelgerhuis Dep. at 152. Van Jelgerhuis allegedly replied to Carson: "I don't know what you're supposed to do about it, Mr. Carson, but we shouldn't have to go through this day in and day out." *Id.*

Although Van Jelgerhuis did report Johnson's harassment on these occasions, she concedes that she never contacted Dan Smith, the Mercury employee designated to receive complaints of sexual harassment. Van Jelgerhuis Dep. at 299–301. This was the case notwithstanding that Smith actually telephoned her on one occasion about the alleged sexual harassment of another Mercury employee. Van Jelgerhuis Dep. at 301. Van Jelgerhuis maintains that she did not report Johnson to Smith because she was afraid of losing her job. *Id.* She also maintains that as part of his campaign of harassment, Johnson would manipulate her by lessening his harassment if he sensed that she was going to report him. Van Jelgerhuis Dep. at 153, 299–300. When Van Jelgerhuis finally confronted Johnson directly, Johnson told her that her "services were no longer needed." Van Jelgerhuis Dep. at 173. At that point, when she asked for permission to contact Smith, Johnson told her it was "too late." *Id.*

*Brooks' Claims:*

Brooks contends that Johnson sexually harassed her as well during her employment at the Mercury Southside Branch. Brooks was employed at the Southside Branch as a cashier, starting in October 1990; however, a year and a half prior to her leaving, Brooks was relocated to a work station approximately twenty feet from Johnson's office. She maintains that at that point Johnson's harassment of her became more "frequent." Brooks Dep. at 68. During this time, according to Brooks, Johnson referred to her as "fat" and "ugly" on innumerable occasions, Brooks Dep. at 114 ("I couldn't count the number of times"), and on more than ten occasions, he remarked on her "fat ass" as she bent over at a file cabinet. Brooks Dep. at 98–100. At least once a month, he allegedly commented on the fact that Brooks was not married to her live-in companion, focusing on the "sex part of it ... eight or nine times." Brooks Dep. at 115–16.

I could just walk in [Johnson's] office and he could say something to the extent that you're so fat, I just don't see how anybody could sleep with you, I don't see how [your boyfriend] can make love to you, how you can do anything, how you can keep him satisfied. . . .

Brooks' Dep. at 117.

Johnson also allegedly commented about once a month on the size of Brooks' breasts during that same year and a half period, stating that Brooks' "boobs were two different sizes." Brooks Dep at 100, 104. He also, on separate occasions, commented on Brooks' bras. Brooks Dep. at 103. Brooks maintains that there were other, additional incidents of harassment involving Johnson. Brooks Dep. at 107.

It is undisputed that Brooks was aware of Mercury's policy prohibiting sexual harassment. Brooks Dep. at 61–62. The employee hotline, however, was established after she left Mercury's employ. It is also undisputed that Brooks never pursued the company's avenues for reporting the harassment, because, as she put it, she "knew better" than to complain about Johnson, Brooks Dep. at 104, and because she believed she would lose her job if she complained about him. Brooks Dep. at 61. Brooks left Mercury on or about May 16, 1994. Brooks Dep. 52, 57. Her letter to the Indiana Department of Employment states that she applied for and was denied a transfer to another Mercury branch. Plaintiffs' Ex. C.

*Nowlin's Claims:*

Nowlin initially worked at Mercury's Southside Branch from early 1992 until August 1993, when she left, in part, due to "some hostility" at the Southside Branch. Nowlin Dep. at 12, 45, 52. However, in May 1994, when her work began to conflict with her son's school schedule, she returned to work at Mercury. Nowlin Dep. at 47–48. According to Nowlin, during her few months of renewed work at Mercury, Johnson would make statements to her, such as "I'm a lonely old man ..., why don't you give me a hug?" Nowlin Dep. at 57. On at least one occasion, she obliged him with a hug, an experience she describes as "very humiliating," although she stated there was nothing

sexual about the embrace. Nowlin Dep. at 59, 77. On another occasion, Johnson allegedly asked her for a backrub. Again, she obliged, although it made her "uncomfortable." Nowlin Dep. at 75–76. On "more than one occasion" Johnson would ask Nowlin to "rub up against him." Nowlin Dep. at 78–79.

Nowlin maintains that she often heard Johnson comment on Brooks' dress and appearance. Nowlin Dep. at 68–69. Although she acknowledges that she heard Johnson refer to himself as fat, Nowlin Dep. at 70, she never saw him hug anyone else in the office, not even his daughter, who also was employed at the branch. Nowlin, at 59. Nowlin could not remember any additional specific incidents. However, she stated that she was "sure there were other comments," Nowlin Dep. at 71–72, 73 and that she was certain there "was more." Nowlin Dep. at 79.

Nowlin concedes that she also knew of Mercury's harassment policy, yet she never pursued any avenue to report Johnson's behavior. Nowlin Dep. at 45–46. Her letter of resignation stated that she was leaving Mercury's employ because of the "hostile work environment" at the Southside Branch. Plaintiffs' Ex. C; Nowlin Dep. at 17. Nowlin resigned from Mercury in July 1994.

## II. LEGAL STANDARDS/ANALYSIS

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med'l Ctr. v. American Med'l Sec., Inc.*, 38 F.3d 316, 319 (7th Cir.1994).

On a motion for summary judgment, the burden rests squarely on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). However, after the moving party has demonstrated the absence of a genuine issue for trial, the responsibility shifts to the non-movants to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d 265. In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movants. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Thus, if doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

### B. Plaintiffs' EEOC Charges

#### 1. Scope of Charge

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. Western and South. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974)); *Prizevoits v. Indiana Bell Tel. Co., Inc.*, 882 F.Supp. 787, 791 (S.D.Ind.1995), *appeal dismissed*, 76 F.3d 132 (7th Cir.1996). Defendants maintain that plaintiffs' disparate impact and treatment claims were not raised in their EEOC charges, and therefore should be dismissed. Defendants' Br. at 2 n. 2. Plaintiffs disagree, and maintain that their charges adequately implicated these claims, notwithstanding that their present legal theories were not mentioned by name. Plaintiffs' Br. at 22–24.

EEOC charges are rarely written by lawyers. Therefore, where an alleged victim of sexual harassment has "made sufficiently like or reasonably related allegations in her charges to the Equal Employment Opportunity Commission to support, and out of which could grow or reasonably be expected to grow, the ... allegations in her judicial complaint," *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 165 (7th Cir.) (en banc), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976) a plaintiff will not be denied her day in court on the basis of an allegedly faulty EEOC charge. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) ("The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions.").

Nonetheless, a plaintiff may not contend that a reasonable relationship exists between an EEOC charge and a complaint merely because the claims contained in each share the general designation of sex discrimination. *Cheek*, 31 F.3d at 500 (stating that "[b]ecause an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination."); *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (finding that plaintiff's "job transfer" sexual harassment claim exceeded scope of EEOC charge regarding training, discharge and hostile environment sexual discrimination claims); *Prizevoits*, 882 F.Supp. at 791 (noting that "[d]ifferent claims of sex discrimination are not necessarily reasonably related to each other"). Thus, while there is no expectation that a layperson filing a charge of discrimination with the EEOC "artfully draft" that charge, a potential plaintiff "must at least have described, with some degree of specificity, the conduct she considered discriminatory." *Cheek*, 31 F.3d at 502.

The afore-referenced principles make it clear that Plaintiffs' EEOC charges do not reasonably relate to the disparate impact and treatment claims they now seek to pursue in this litigation.

a. Plaintiffs' Disparate Impact Claim

"A disparate impact exists where a specified employment practice, although neutral on its face, has a disproportionally negative effect on members of a legally protected class." *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir.1996) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988)). In order to state a prima facie case of disparate impact, a plaintiff must first identify the specific employment practices allegedly responsible for the disproportionate impact, and secondly indicate the cause of that impact using statistical evidence. *Vitug*, 88 F.3d at 513; *Daniels v. Pipefitters' Assoc. Local Union No. 597*, 945 F.2d 906 (7th Cir.1991) (race discrimination), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992).

Plaintiffs' charges make no mention of employment practices with an allegedly skewed negative effect on women at Mercury. All three charges contain general language indicating that each plaintiff believed she was discriminated against in violation of Title VII on the basis of her sex. Defendants' Ex. A. More specifically, Brooks' charge states that she was "subjected to verbal abuse" and that she was "offended" by comments that "referenced [her] sex and weight." Defendants' Ex. A (Brooks' EEOC charge). Nowlin's charge states that she was "sexually harassed by Jim Johnson, Branch Manager" even after he was "made aware that his advances were unwelcome." Defendants' Ex. A (Nowlin EEOC Charge). Van Jelgerhuis' charge states that she and others were "subjected to sexual harassment and a hostile work environment" at the hands of Johnson. Her amended charge asserts that Mercury and Johnson were providing her prospective employers with a "negative impression" of her "in retaliation for filing the initial [EEOC] charge." Defendants' Ex. A (Van Jelgerhuis EEOC charges). None of plaintiffs' charges reasonably implicates Mercury's employment practices. Accordingly, summary judgment is granted on the disparate impact claim of Plaintiffs' Complaint.

### b. Plaintiffs' Disparate Treatment Claim

■ Summary judgment is likewise appropriate on plaintiffs' claim that they endured disparate treatment "with respect to conditions and hours of employment." Plaintiffs' Complaint (Count IV). The Seventh Circuit has made clear that a general charge to the EEOC will not suffice to allow a plaintiff to proceed into court on legal theories and facts not at least alluded to previously in an EEOC charge. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir.1992). The EEOC charges filed by plaintiffs all point to a claim of hostile work environment. Although, at first blush, an EEOC charge with information sufficient to assert a hostile work environment claim might arguably extend to a claim of disparate treatment, cf. *Vitug*, 88 F.3d at 513 ("Disparate treatment, 'the most easily understood type of discrimination,' occurs when a plaintiff is intentionally treated less favorably than others simply because of his race, color, religion, sex or national origin." (quoting *Watson*, 487 U.S. at 985–86, 108 S.Ct. at 2784), plaintiffs failed to include in their charges any specific or even general references to the alleged disparate treatment practices they now seek to redress in this court. *See* Plaintiffs' Br. at 24 n. 14 (describing different work expectations as well as different schedule requirements for men and women in the Mercury's Southside office); *cf. Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir.) (plaintiff's EEOC charge fairly contained disparate treatment claim where she described that male employees received greater compensation than females), *cert. denied*, — U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). Because their EEOC charges made no mention of different work schedules or compensation for the male and female employees at Mercury, plaintiffs' allegations of disparate treatment must be dismissed. Summary Judgment accordingly is granted on Plaintiffs' disparate treatment claims.

### 2. *300–Day Window*

■ As a general rule, in a "deferral state," such as is Indiana, a plaintiff must file an EEOC charge within 300 days of the occurrence of the event that forms the basis of the complaint. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir.1994) (Indiana); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 707 (7th Cir.1995) (Illinois). Applying this rule, Van Jelgerhuis may not seek relief for allegedly discriminatory events occurring before October 16, 1993; Brooks may not seek relief for events prior to December 9, 1993; and Nowlin, not prior to December 17, 1993. This does not present a bar to relief for any events alleged by Nowlin; on the other hand, Van Jelgerhuis clearly, and Brooks somewhat vaguely, both seek to include events that occurred more than 300 days prior to the filing of their charges. Defendants devoted a single, footnote paragraph to this issue and misidentified the dates prior to which relief would generally be barred under the 300–day rule. *See* Defendants' Br. at 28 n. 13.

■ The "continuing violation" theory allows a plaintiff to be eligible for relief on an otherwise time-barred act if the plaintiff can successfully link it with an act occurring within the limitations period. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) (stating "[t]here must be a violation within the period of the statute of limitations. If having proved such a violation, the plaintiff goes on to prove that it began earlier and that its earlier manifestation caused him additional injury, he can obtain a remedy for the increment as well as for the injury inflicted by the recent violation."). A claim of hostile-work environment frequently involves a continuing violation. *See, e.g., Saxton v. American Tele. & Tele. Co.*, 10 F.3d 526, 532 n. 1 (7th Cir.1993); *Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir.1993) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 476 (5th Cir.1989); *Stephenson v. Aluminum Co. of America*, 915 F.Supp. 39, 49 (S.D.Ind.1995).[1]

---

1. Whether a plaintiff may recover for events occurring more than 300 days prior to an EEOC filing obviously affects the relief potentially available to a plaintiff. However, even when events are time-barred, and thus, relief is unavailable, those events may still be relevant to determining whether a hostile work environment existed. When examining the "totality of the circum-

■ There must be a "sufficiently close nexus" between and among the allegedly discriminatory acts in order for there to be a continuing violation, rather than " 'merely discrete, isolated, and completed ... individual violations.' " *Doe,* 42 F.3d at 446 (citation omitted). In *Selan,* the Court of Appeals listed three factors properly considered in determining whether a nexus is sufficiently close to justify extending the limitations period.[2] *Id.* at 565. The first factor relates to subject matter: "Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?"; the second, to frequency: "Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision?"; the third, to permanence: "Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights ... ?". *Selan,* 969 F.2d at 565. It is the third factor that has prompted courts to characterize the continuing violations doctrine as a variation on the theme of equitable tolling. *See, e.g., Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996) ("What is true is that standard principles of limitations law, notably the discovery doctrine and the doctrines of equitable estoppel and equitable tolling, excuse the claimant from having to file before it is feasible for him to do so, and these principles apply to cases brought under Title VII."); *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282

(7th Cir.1993) (noting that the result of applying the continuing violations doctrine "follows directly from the doctrine of equitable tolling.").

The Seventh Circuit recently articulated the "principle ... that ... organizes the complex and diffuse case law on continuing violations under Title VII [as: a] plaintiff may not base her ... suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." *Galloway,* 78 F.3d at 1167.

■ In this case, Johnson's alleged actions towards plaintiffs were basically of the same ilk and, if true, occurred with unfortunate regularity. *Cf. Ficek v. Griffith Lab., Inc.,* No. 93–C–6178, 1995 WL 42081, at *5 (N.D.Ill. Feb. 1, 1995) (stating that ongoing harassment sustained continuing violation doctrine where "the acts [were] all similar in that they had only one objective ...—to belittle [plaintiff]."). More significantly, none of the harassing acts described by either Van Jelgerhuis or Brooks, was of such a permanent nature that their hostile work claims ought to have been triggered at a particular point significantly earlier than the

stances" as they existed in a work environment, it would defy common sense to lower an "iron curtain" at the 300 day mark merely because relief is not available for events occurring before that date. *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1349 (7th Cir.1995) (permitting evidence of pre–1991 conduct in consideration of punitive damages award, only available after November 1991 effective date of Title VII amendments); *Ellerth v. Burlington Indus., Inc.,* 912 F.Supp. 1101, 1113 (N.D.Ill.1996) (considering conduct occurring prior to EEOC charge filing date in hostile environment claim); *Nishijima v. Morton Grove Park District,* No. 93–C–5193, 1994 WL 142967, at *3 (N.D.Ill. Apr. 15, 1994) (stating that a "plaintiff may not seek recovery for prior discriminatory acts that were not raised before the EEOC, but she may offer evidence concerning those acts as background to prove that she was reasonable in concluding that the later acts (which were the subject of the EEOC charge were discriminatory in a manner that compelled her to resign.")); *Abdulrahim v.*

*Gene B. Glick Co., Inc.,* 612 F.Supp. 256, 260 (N.D.Ind.1985) (stating that "time-barred incidents of discrimination are not to be erased from a case because of their tardiness. Certainly, no relief can be obtained for those acts.... However, those events may be used as background....").

2. The court also discussed three applications of the continuing violations doctrine: (1) cases typically involving hiring or promotion practices, where an employer's decision-making process occurs over a period of time; (2) cases where an employer has an express policy alleged to be discriminatory; and (3) cases involving an ongoing, "serial violation", "evidenced only by a series of discrete, allegedly discriminatory acts." *Selan,* 969 F.2d at 565 (quoting *Stewart v. CPC Int'l, Inc.,* 679 F.2d 117, 121 (7th Cir.1982)). Only the third application of the doctrine is arguably applicable to the case at bar.

300–day period prior to their EEOC-filing dates. In *Galloway*, the Seventh Circuit applied the continuing violations doctrine, stating that defendant's "repeated 'sick bitch' comments ... [were] just the kind of verbal conduct that it would not be reasonable to expect an employee to base suit on the first time it occurred.... But if the comment were repeated daily over a period of years its cumulative effect would be much greater.....". 78 F.3d at 1167. The *Galloway* holding applies perforce where a supervisor's comments were repeated with the frequency described by plaintiffs for a period of over a year and a half. This is especially true where as part of the alleged pattern of harassment described, the defendant behaved strategically to manipulate not only his victims' environment, but also their reactions to his abuse. According to Van Jelgerhuis:

> Mr. Johnson knew how far he could push you and how much you could take and he would push you as far as you could go and push you almost to that line and then when you got to that point, he would back off, when you were ready to go to Dan Smith or you were ready to go to whoever, and then he'd ease up a little bit and come back in and start it all over again.

Van Jelgerhuis Dep. at 299–300; *see also id.* at 153.[3]

Both Van Jelgerhuis and Brooks contend that Johnson harassed them throughout the 300–day period prior to their EEOC filings. Van Jelgerhuis maintains that she sent a letter to Mercury's human resources office during the 300–day period prior to her EEOC filing, and she maintains she spoke with her operations manager on two occasions (one at an unspecified time). *Doe*, 42 F.3d at 446 (declining to apply continuing violations doctrine "because no harassment event occurring during the violation period was ever brought to the attention of [defendant] ... there is no violation during the limitation period that can serve as the anchor for the earlier conduct."). Both plaintiffs describe Johnson's behavior as part of an ongoing course of similar and frequent harassment. It is difficult, to say the least, to pinpoint precisely when a plaintiff ought to know that the harassment she is enduring rises to the level of a hostile environment claim. *Cf. Galloway*, 78 F.3d at 1166 ("Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one-time event. In its early stages it may not be diagnosable as sex discrimination, or may not cross the threshold that separates the nonactionable from the actionable...."). Defendants have not moved specifically to exclude any alleged event from consideration of plaintiffs' hostile work environment claims. *Cf. Saxton*, 10 F.3d at 532 n. 11 ("because [defendant] has devoted no more than a skeletal paragraph to this issue, and because the record does not clarify the timing of the last acts of harassment, we will not undertake to parse [plaintiff's] claims in an effort to weed out time-barred incidents.' "); *Young v. Will County Dep't of Public Aid*, 882 F.2d 290, 292 (7th Cir.1989) (stating, on motion for summary judgment, that "[a]ll doubts on jurisdictional timeliness are to be resolved in favor of trial."). Thus, applying the continuing violations theory, plaintiffs Van Jelger-

---

**3.** Notwithstanding Johnson's alleged manipulation of Van Jelgerhuis (defendants offer no evidence relating to Brooks' awareness of a possible actionable claim pre-dating the 300–day period prior to filing her EEOC charge), Van Jelgerhuis did attempt to assert her rights by personally alerting both the operations manager on site and a supervisor at a different branch to Johnson's behavior, with no apparent response. Van Jelgerhuis also contends that she anonymously wrote a letter directed to the human resources office, notifying them of Johnson's conduct, again, with no apparent response. Cf. *Doe*, 42 F.3d at 446 (declining to apply doctrine not only because there was no sufficient nexus between conduct of a supervisor at one work site and behavior of coworkers at a different site, but also because "[plaintiff], under her own theory of the case, was aware of the nature of [defendant's] conduct as it occurred ... and ... she chose not to file any complaints."); *Kolnicki v. Ford Motor Co.*, No. 94–C–7573, 1995 WL 431185, *8 (N.D.Ill. July 17, 1995) (declining to apply continuing violations doctrine to discriminatory acts predating the 300–day period prior to the EEOC charge filing because plaintiff "failed to notify anyone ... about the ... incidents until two days before her resignation, and even then she refused to identify the alleged perpetrators."). Application of the continuing violation theory is justified when the plaintiff has allegedly complained about a hostile work environment and has received no response from the employer.

huis and Brooks will not be barred from including allegedly discriminatory events occurring more than 300 days prior to their EEOC filings in establishing their entitlement to relief.

## C. Title VII: Hostile Work Environment [4]

 It is well established that Title VII embraces sex discrimination claims based on the theory of a hostile work environment. *See, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1453 (7th Cir.1994). The test for an actionable hostile work environment under Title VII includes both an objective and subjective inquiry. *Dey,* 28 F.3d at 1454; *Ripberger v. Western Ohio Pizza, Inc.,* 908 F.Supp. 614, 618–19 (S.D.Ind.1995). If a work environment "would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Harris,* 510 U.S. at 22, 114 S.Ct. at 371; *Dey,* 28 F.3d at 1453 & n. 7. The allegedly discriminatory conduct must have the "purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405; *Ripberger,* 908 F.Supp. at 618. In addition, in order for harassment to be actionable under Title VII, it must have occurred because of a plaintiff's sex, although "[s]ex discrimination, including harassment, can take many forms and is not limited to sexual behavior that is harassing." *Bilbrey v. Werts Novelty Co.,* 881 F.Supp. 370, 375 (S.D.Ind.1994); *see also Ripberger,* 908 F.Supp. at 619.

### 1. Objective Harassment

 The bounds of what, objectively, constitutes a hostile work environment elude precise demarcation. *See, e.g., Harris,* 510 U.S. at 22, 114 S.Ct. at 371 ("[t]his is not, and by its nature cannot be, a mathematically precise test."); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). Certainly, harassment "must be sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). Factors informing whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. Yet "no single factor is required," and whether a work environment is objectively hostile "can be determined only by looking at all the circumstances." *Id.* Isolated incidents will not by themselves create an actionable hostile work environment, *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1345–46 (7th Cir. 1995) ("[t]hough sporadic behavior, if sufficiently abusive, may support a Title VII claim, success often requires repetitive misconduct."); *Koelsch,* 46 F.3d at 708 ("Isolated and innocuous incidents do not support a finding of sexual harassment"), however it is clear that there is no "magic number" of discriminatory events required to trigger Title VII. *Doe,* 42 F.3d at 445; *Rodgers v. Western–Southern Life Insurance Co.,* 12 F.3d 668, 674 (7th Cir.1993).

In *Baskerville,* the Seventh Circuit stated that "[d]rawing the line is not always easy." 50 F.3d at 430. The court has provided guidance, explaining that "[o]n one side [of the line] lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures." *Id.* On the other side, "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish

---

**4.** Defendants also move to dismiss Count II of Plaintiffs' Complaint, a hostile work environment claim, on the ground that it merely adds a charge of intent to Plaintiffs' Count I hostile work environment claim. *See* Defendants' Br. at 2 n. 2.

Plaintiffs offer no opposition to this portion of defendants' motion. Accordingly, summary judgment is granted on Count II of Plaintiffs' Complaint.

workers." *Id.; see also Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1010 (7th Cir.1994). Thus, in *Baskerville,* where the defendant did not threaten plaintiff, expose himself to her, or say "anything to her that could not be repeated on primetime television," let alone invite her "explicitly or by implication to have sex with him," the court held that, objectively, plaintiff could not state a claim for hostile work environment. *Baskerville,* 50 F.3d at 431.

██ Both Van Jelgerhuis and Brooks describe Johnson as directing extremely offensive, sexual comments at them in language not appropriate for late-night cable, let alone primetime television. All three plaintiffs complain about Johnson's persistent comments regarding their appearances. Johnson allegedly routinely called the plaintiffs "fat" and "ugly", and he placed particular emphasis on how their looks related to their sex lives. Johnson also reportedly commented to more than one plaintiff on the size of her breasts, and he allegedly asked plaintiffs inappropriate questions about their sexual relationships. *Cf. McCleland v. Montgomery Ward & Co., Inc.,* No. 95–C–237, 1995 WL 476607 (N.D.Ill. Aug. 10, 1995) (denying summary judgment where plaintiff alleged hostile work environment based on events occurring over five-month period, including that defendant asked "unsolicited questions about her boyfriend and told her he could satisfy her better than her boyfriend."). Nowlin maintains that Johnson often "rubbed up" against her. All three plaintiffs contend that there were additional incidents of harassment by Johnson not referenced specifically in their depositions. Van Jelgerhuis Dep. at 277; Brooks Dep. at 107; Nowlin Dep. at 72–73; *cf. Dey,* 28 F.3d at 1456–57 (denying summary judgment where plaintiff could recall only the "most blatant" five incidents of harassment over a two-and-a-half- year period, yet maintained "she was subjected to almost daily comments, gestures and innuendo of a sexual nature....").

Drawing all reasonable inferences in favor of plaintiffs, they were subjected to an objectively hostile work environment at Mercury's Southside Branch. Plaintiffs describe an ongoing campaign of sexual harassment waged by Johnson—not merely discrete, isolated incidents of inappropriate behavior. *Cf. Koelsch,* 46 F.3d at 708 (holding that no hostile work environment objectively existed where plaintiff alleged "two seemingly isolated incidents"); *Saxton,* 10 F.3d at 534, 535 (finding that plaintiff failed to demonstrate objective hostile work environment where she alleged "relatively limited" harassment after which defendant had "long since stopped pursuing [plaintiff]"); *Weiss,* 990 F.2d at 337 (affirming summary judgment where plaintiff alleged "relatively isolated" incidents of relatively innocuous acts by defendant). This inference is strengthened when the environment, as described by plaintiffs, is considered as the sum of their collective experiences.

██ Courts may consider third parties', or co-plaintiffs', impressions of and experiences in a work environment when a plaintiff maintains she was aware of defendant's sexual harassment of other employees in a workplace.[5] The question of whether third parties' experiences may be marshalled by a Title VII plaintiff to sustain a claim that the environment was hostile to women has never been directly addressed by the Seventh Circuit; however, it has been implicitly answered. *See, e.g., Brooms v. Regal Tube Co.,* 881 F.2d 412, 419 (7th Cir.1989) (endorsing objective and subjective analysis for hostile environment claim and listing factors for consideration endorsed by Sixth Circuit as including "the background and experience of the plaintiff [and] her coworkers") (citing *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Dey,* 28 F.3d 1446, 1456 (noting that general, gender-related comments not directed specifically at plaintiff would be actionable under Title VII) (citing 58 Fed.Reg. 51266, 51269

**5.** Defendants imply that we ought not consider collectively the plaintiffs' claims because, in depositions, plaintiffs stated that their claims "rise or fall on their own." However, these layper-sons' assessments on a question of law are hardly dispositive of an issue affecting their claims, let alone binding on this court.

(proposed 29 CFR § 1609.1(d)) ("Harassing conduct may be challenged even if the complaining employee(s) are not specifically intended targets of the conduct."); *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 460 n. 4 (7th Cir.1990) (referencing corroborating testimony of two non-party female employees' for objective hostile environment analysis). The Seventh Circuit routinely includes among the factors to consider in assessing the objective hostility of a work environment in claims involving race discrimination, "the nature of the alleged harassment, the background and experience of the plaintiff [and] her coworkers...." *See, e.g., Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir.1993); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir.1991). However, this language has not been generally adopted in the context of environment claims based on sex. *But see Brooms*, 881 F.2d at 419 (early hostile environment claim referencing factors typically listed as appropriate for consideration in context of claim on basis of race).

Other circuits that have directly tackled this issue consistently have held in favor of referencing third-party evidence to determine whether a work environment was hostile to women on the basis of their sex. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415–16 (10th Cir.1987); *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1014–15 (8th Cir. 1988) (holding appropriate the "consider[ation of] all of the women's claims together in determining that the harassment was sufficiently pervasive and severe to constitute a violation of Title VII" and that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile work environment."); *Jones v. Flagship Int'l*, 793 F.2d 714, 721 n. 7 (5th Cir. 1986) (pre-*Harris* case stating that incidents of sex harassment reported by female employees would be considered in hostile environment claim only with evidence that those incidents "affected [plaintiff's] psychological well-being."), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C.Cir.1985) (stating that "evidence tending to show [defendant's] harassment of other women working alongside [plaintiff] is directly relevant to the question whether he created an environment violative of Title VII. Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive"), *aff'd on other grounds, Meritor*, 477 U.S. at 57, 106 S.Ct. at 2399.

District courts in this circuit who have struggled with the question have almost invariably considered the complaints of non-plaintiffs in determining whether an environment was hostile to women on the basis of their sex existed in a workplace. *See, e.g., Valadez v. Uncle Julio's of Illinois, Inc.*, 895 F.Supp. 1008, 1013 (N.D.Ill.1995) (stating that "the court can consider evidence of sexual harassment directed at other employees of the same sex as plaintiff" when determining existence of hostile work environment); *Jansen v. Packaging Corp. of America*, 895 F.Supp. 1053, 1062 n. 11 (N.D.Ill.1995) (noting that "[c]ourts have cited the earlier or concurrent harassment of third parties as evidence that the currently-charged harassment was sufficiently pervasive or severe to constitute a violation of Title VII.... Less frequently such third parties' testimony is offered to establish an employer's awareness of a hostile work environment."); *but see Janopoulos v. Harvey L. Walner and Associates*, 866 F.Supp. 1086, 1092 (N.D.Ill.1994) (declining to permit testimony of other employees to establish existence of hostile environment, limiting it to the question of employer notice).

■ It is difficult to imagine a convincing rationale for a contrary rule in hostile environment claims. As the Tenth Circuit stated in *Hicks:*

Whether incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's claim of a hostile work environment, the answer seems clear: one of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim.

*Hicks,* 833 F.2d at 1415–16; *see also Creamer v. Laidlaw Transit, Inc.,* 86 F.3d 167, 171 (10th Cir.1996) ("Although 'evidence of a general work atmosphere, including evidence of harassment of other women, may be considered in evaluating a claim' of sexual harassment, the plaintiff 'may only rely on evidence relating to harassment of which she was aware during the time she was allegedly subject to a hostile work environment'") (quoting *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir. 1995)). Thus, where a plaintiff maintains she was aware of a defendant's hostile treatment of other women in a work environment she will not be precluded from having those other allegedly discriminatory incidents be considered in the determination of whether a work environment was objectively hostile.[6] A reasonable trier of fact could determine that, in addition to their own first-hand experiences with Johnson, plaintiffs were also aware of the more widespread hostile environment Johnson created by his actions towards other women in the Southside Branch. There exist genuine issues of material fact regarding whether plaintiffs were aware of Johnson's harassment of each other, as well as of other women in the office. *See, e.g.,* Van Jelgerhuis Dep. at 216 ("I've seen Jim Johnson stand in his office and holler about the girl's chest in the front of the office."); Plaintiffs' Ex. B at 3(a) (Brooks describing comments she heard Johnson make regarding Van Jelgerhuis); Nowlin Dep. at 21 (stating that she and Brooks spoke frequently during their employment at Mercury); Nowlin Dep. at 68 (stating that Johnson was "always" making comments about Brooks' appearance).

Plaintiffs individually, as well as collectively, describe an ongoing course of sexual harassment waged against them by Johnson that objectively rises to a level of hostile work environment. Accordingly, defendants are not entitled to summary judgment on this basis.

### 2. Subjective Harassment

▉ There also remain genuine issues of material fact that preclude summary judgment on the question of whether plaintiffs subjectively experienced a hostile work environment at Mercury's Southside Branch. Plaintiffs describe feeling "humiliated," "embarrassed" and demeaned by Johnson's behavior. *See, e.g.,* Van Jelgerhuis Dep. at 267; Brooks Dep. at 102; Nowlin Dep. at 59. Van Jelgerhuis states that after the February 1993 incident she left work; Brooks stated that after Johnson made comments to her, she would just turn around and walk out of his office. Brooks Dep. at 104, 117–118; *Cf. Dey,* 28 F.3d at 1454 (denying summary judgment where plaintiff "maintained that on more than one occasion, [defendant's] comments caused her to walk out of his office."). Nowlin's letter of resignation stated she was leaving because of a hostile work environment. Plaintiffs' Ex.C. And Van Jelgerhuis complained that no one should have to work under the conditions as they were at Mercury. Van Jelgerhuis Dep. at 152, 269.

▉ Defendants maintain, however, that plaintiffs participation in bawdy office talk evidences that they were not as subjectively offended by their environment as they now claim. Defendants' Br. at 15. However, a woman does not forfeit her right to be free from sexual harassment by virtue of her participation in sexual banter. *See, e.g., Carr,* 32 F.3d at 1011 (rejecting idea of "welcome sexual harassment," while acknowledging that "[a] plaintiff's words, deeds and deportment can cast light on whether her coworkers' treatment of her was unwelcome and should have been perceived as such by them and their supervi-

---

**6.** The requirement that a plaintiff be aware of third parties experiences in order to assemble them in support of a hostile environment claim fully accords with the use of evidence in other types of Title VII cases asserted on the basis of sex discrimination. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (requiring link of defendants' stereotyping comments to specific plaintiff in order to ground "discrimination in air" to "discrimination visited upon the employee"); *Sample v. Aldi Inc.,* 61 F.3d 544, 551 (7th Cir.1995) (race discrimination plaintiff must show "link" between statistical evidence and individual employment decision at issue); *Chambers,* 17 F.3d at 1004 (applying *McDonnell Douglas* test, and requiring that plaintiff demonstrate "link" between indirect evidence and the employment decision affecting her).

sors"). While plaintiffs' comportment and behavior in the Mercury office are certainly relevant to evaluating their subjective perception of the environment there, a reasonable trier of fact could determine that plaintiffs' interactions with their coworkers were voluntary and non-threatening, while the dynamic created by Johnson was hostile and intimidating. *See* Van Jelgerhuis Dep. at 102 (distinguishing coworkers' conversations from the interaction with Johnson, stating "I could say to her ... I don't think that's appropriate and not fear for being fired or discharged from my job."). Comments and behavior that may be perceived as innocuous, albeit lewd, banter between coworkers may justifiably be perceived as hostile and abusive if directed by a male supervisor to a female subordinate. *Rodgers,* 12 F.3d at 675 ("a supervisor's use of the term impacts the work environment far more severely than use by co-equals."); *see also Carr,* 32 F.3d at 1011 ("The asymmetry of positions must be considered.").

Finally, defendants maintain that plaintiffs' actions towards Johnson fatally undermine their claim that they perceived him to have created a hostile work environment at Mercury. Defendants point to a number of occasions when plaintiffs sought advice from him, in one case borrowed money from him for a sister's abortion, and, in another instance, actually enlisted his help to stop a former lover who was attempting to blackmail Van Jelgerhuis. *See, e.g.,* Brooks Dep. at 41, 44; Van Jelgerhuis Dep. at 207–08, 213–14. However, again, plaintiffs' behavior does not necessarily refute their claim that they felt Johnson harassed and humiliated them. *Cf. Dey,* 28 F.3d at 1455 (stating that plaintiff's seeking legal and financial advice from defendant did "not necessarily contradict her assertions that [defendant's] conduct consistently upset and embarrassed her"). A reasonable trier of fact could determine that plaintiffs felt intimidated and mistreated by Johnson, yet still found themselves compelled to appeal to him when their other options were few.

### 3. "On The Basis of Sex"

▆▆ Whether Johnson harassed the plaintiffs on the basis of their sex again creates a genuine issue of material fact. All of the plaintiffs concede that Johnson was preoccupied generally with obesity. Van Jelgerhuis Dep. at 234; Brooks Dep. at 39, 95; Nowlin Dep. at 56. They also acknowledge that Johnson belittled men and women employees in the southside branch. *See, e.g.,* Van Jelgerhuis Dep. at 237; Brooks Dep. at 95. However, drawing all reasonable inferences in favor of plaintiffs, it is clear that each had demeaning encounters with Johnson that were clearly sex based. *Cf. Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1043 (7th Cir.1994) ("It blinks reality to claim that sexual conduct which demeans women by a man in a position of power, even if not directed at a specific woman victim, equally impacts male and female subordinates."). A reasonable trier of fact could determine that Johnson harassed both his women and men employees *and* that he discriminated against plaintiffs on the basis of their sex. These would not necessarily be inconsistent determinations, and on this motion for summary judgment, give rise to an inference supportive of plaintiffs' accounts of events at the Mercury Southside Branch.

### 4. *Defendant's Liability Under Title VII*

#### a. Claims against Johnson

In *Equal Employment Opportunity Commission v. AIC Security Investigations, Ltd.,* the Seventh Circuit held that individuals cannot be liable under Title VII because the statute's use of the term "employer" does not embrace individual liability. 55 F.3d 1276, 1281 (7th Cir.1995). Plaintiffs do not disagree. Accordingly, Johnson personally is entitled to summary judgment on the Title VII claims against him.

#### b. Claims against Mercury

▆▆ An employer is not strictly liable for a hostile work environment created by its employees. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408 (holding that agency principles "place some limits on the acts of employees for which employers under Title VII are to be held responsible."); *Doe,* 42 F.3d at 446 ("employers are not absolutely liable for workplace harassment"). It is clear that if a

hostile work environment is created by co-workers of a victim, the standard for an employer's liability is negligence. *Carr,* 32 F.3d at 1009; *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990). In the case of a hostile work environment created by a supervisor, however, there is some uncertainty regarding the appropriate standard of employer liability.

In *Meritor,* the Supreme Court specifically ruled that the lower court erred in "concluding that employers are always automatically liable for sexual harassment *by their supervisors,*" invoking traditional agency principles to determine employer liability. *Id.* at 58, 106 S.Ct. at 2401 (emphasis added). While there is little question regarding what constitutes actual authority for an agent, *see, e.g., Ripberger,* 908 F.Supp. at 622 (stating that sexual harassment "cannot be considered to be authorized, appropriate, foreseeable, or 'actuated by an intent to serve' the employer") (quoting Restatement § 235 cmt. a), the question of what constitutes apparent authority has left the door open for courts to impose strict liability on employers in some, though not clearly defined instances. For example, in *Baskerville* the Seventh Circuit stated that:

> [a]n employer is not strictly liable for sexual harassment of one worker by another unless, perhaps, the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him. In such cases, a number of courts treat the supervisor *as* the employer, whether correctly or not we need not decide. (Neither the Supreme Court nor our court has had occasion to decide the question.)

50 F.3d at 431–32. And, in *Saxton,* it stated:

> [o]f course, if someone in the employer's decision-making hierarchy engages in harassment, the employer may be held liable regardless of whether it could reasonably have foreseen or prevented the misconduct, for in that instance, the acts of the managerial employee constitute the acts of the employer.

10 F.3d 526, 536 n. 19.

Some courts, in an effort to clarify the concept of apparent authority, have used an employee's ability to "hire and fire" as a means to determine whether the employer should be strictly liable for the supervisor-created hostile environment. *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990); *Volk v. Coler,* 845 F.2d 1422, 1436 (7th Cir. 1988); *North v. Madison Area Ass'n for Retarded Citizens–Dev. Ctrs. Corp.,* 844 F.2d 401, 407 (7th Cir.1988); *Ibrahim v. Holidays Inn, Inc.,* No. 95–C–4316, 1996 WL 199743 (N.D.Ill. Apr. 23, 1996); *see also Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986), *but see Brooms,* 881 F.2d at 421 (labelling *Hunter* language "dicta").

It is undisputed that Johnson was the supervisor of the Mercury Southside Branch with power to hire and fire employees. However, whether a standard other than negligence governs Mercury's liability for the allegedly hostile work environment at the Southside Branch need not be resolved at this time, because Mercury may be liable for Johnson's actions applying a negligence standard.[7]

 Mercury maintains that because an employer may not be held strictly liable for the acts of an employee, it is entitled to summary judgment on Plaintiffs' Title VII claim. However, an employer, "provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action." *Carr,* 32 F.3d at 1009; *Guess,* 913 F.2d at 465.[8]

---

7. The record before the court at this time does not clearly indicate whether Johnson was high enough within Mercury's managerial hierarchy to merit a standard of employer liability more rigorous than negligence. *Cf. Saxton,* 10 F.3d at 536 n. 19 (acknowledging the possibility that high-ranking employees can create strict liability for employers, but declining to invoke where supervisor was regional and the employer was the AT & T mega-corporation). In addition, Johnson reportedly threatened plaintiffs' present and future job security to dissuade them from reporting his harassment, arguably invoking his apparent authority to harass plaintiffs.

8. Plaintiffs do not allege that Mercury failed to exercise due care in its hiring of Johnson.

Defendant also contends that summary judgment is warranted because Plaintiffs failed to access the Company's designated channels to report their alleged harassment. Mercury insists that, notwithstanding that Van Jelgerhuis made a number of attempts to report Johnson, none of the people with whom she spoke had a duty to relay that information to the Company. In order for liability to attach, an "agent must have a duty to speak with respect to the specific item of knowledge." *Doe*, 42 F.3d at 446–47; *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (citations omitted) (" 'the agent must have not just a duty in relation to the subject matter, but a duty to speak to his principal about the specific item of knowledge.' ").

### 1. *Van Jelgerhuis*

■ Van Jelgerhuis concedes that she never contacted Smith, the Mercury employee designated to receive complaints of sexual harassment. Van Jelgerhuis Dep. at 299–301. She admits this is the case, notwithstanding that during the time Johnson was harassing her, she had a conversation with Smith regarding the unrelated harassment of another Mercury employee. Van Jelgerhuis Dep. at 301. However, Van Jelgerhuis maintains that she did notify other appropriate managers at Mercury of Johnson's harassment. She contends that she informed Johnson's counterpart at Mercury's Anderson Branch of the February 1993 Johnson dream incident. Van Jelgerhuis Dep. at 153. Van Jelgerhuis maintains that she also spoke on at least two different occasions with her direct supervisor, Joe Carson, about the problems with Johnson. Van Jelgerhuis Dep. at 151–52, 164. Although a subordinate of Johnson's, it is undisputed that Carson was the Operations Manager at the Southside Branch. *See* Defendants' 56.1 Statement at 2. In addition, Van Jelgerhuis maintains that she attached a three-page letter to a Mercury workplace survey distributed by Mercury's president, John Brincat. Van Jelgerhuis Dep. at 144, 150. Although she acknowledges that the letter identified neither the writer nor her branch, Van Jelgerhuis maintains that she described in graphic terms the work environment she endured.

Van Jelgerhuis Dep. at 148–50 (describing letter's contents as including accounts of Johnson's behavior in the office as well as recommendation that "someone investigate the office" because the work environment was insufferable).

The only response that Van Jelgerhuis ever received from Mercury regarding her complaints came from Joe Carson, who said:

> What do you want me to do[?] If I say it to him [Johnson], he's going to ride you harder.... If I don't say anything you're going to be upset.... What do you expect me to do about it?

Van Jelgerhuis Dep. at 152. Van Jelgerhuis maintains she replied to Carson: "I don't know what you're supposed to do about it, Mr. Carson, but we shouldn't have to go through this day in and day out." *Id.*

Mercury's policy prohibiting sexual harassment requires management employees to respond to complaints of sexual harassment. Defendants' Ex. F ("Appropriate management and supervisory personnel shall take prompt, corrective action when they become aware of sexual harassment."). There is at least a genuine issue of fact regarding whether Carson and Markle were "appropriate" supervisors upon whom a duty to report sexual harassment was imposed by Mercury's own policy. *Cf. Juarez*, 957 F.2d at 321 (finding no duty to report where company's policy did not require it of supervisor with knowledge of alleged sexual harassment); *McCleland v. Montgomery Ward & Co., Inc.*, No. 95–C–237, 1995 WL 476607, at *9 (N.D.Ill. Aug. 10, 1995) (stating that company policy required managers to report complaints of harassment, thus raising genuine issue of material fact whether duty appropriately imposed). The record is devoid of any evidence that Mercury responded to Van Jelgerhuis' complaints. Thus, a trier of fact could reasonably find that Mercury was negligent in its handling of the hostile work environment at the Southside Branch. Summary judgment is accordingly denied on Van Jelgerhuis' Title VII hostile environment claim.

### 2. Brooks & Nowlin

There is also a genuine issue of material fact precluding summary judgment on the question of whether Mercury had constructive knowledge of Johnson's allegedly harassing behavior such that Brooks and Nowlin did not themselves need to report directly Johnson's harassment. An employer may have constructive knowledge of an employee's harassment by virtue of prior complaints lodged by other victims regarding the alleged harasser. *Hirase–Doi*, 61 F.3d at 784; *Dey*, 28 F.3d at 1458; *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir.1989); *Ripberger*, 908 F.Supp. at 624; *Doe v. R.R. Donnelley & Sons Co.*, 843 F.Supp. 1278, 1283 n. 2 (S.D.Ind.1994), *aff'd, Doe*, 42 F.3d 439. Van Jelgerhuis complained twice to Joe Carson, the Operations Manager at the Southside Branch, about the conditions there; she also maintains she contacted the Anderson Branch Supervisor regarding Johnson's behavior. Finally, there is the anonymous letter Van Jelgerhuis maintains she attached to the Mercury survey distributed at the behest of the company's president. Although the letter was admittedly anonymous and failed to specify the Southside Branch, it is difficult to imagine an employer reasonably disregarding a three-page letter describing the events represented by Van Jelgerhuis; particularly in response to a company-president endorsed survey purportedly about workplace conditions and when the company's own procedures invite anonymity. *See* Defendants' Ex. G (policy establishing Hotline). Even assigning the letter the slightest weight, however, a reasonable trier of fact could determine that it sufficed to give constructive notice of Johnson's harassing behavior and the attendant hostile work environment at the Southside Branch, given in addition Van Jelgerhuis' complaints to Carson and Markle. Accordingly, Mercury's summary judgment motion is denied on Brooks' and Nowlin's Title VII hostile environment claims.

### 5. Constructive Discharge

The viability of plaintiffs' hostile environment claims under Title VII does not, as defendants maintain, turn on the issue of whether plaintiffs were discharged—constructively or otherwise. Prior to the enactment of the 1991 amendments, under the provisions of Title VII, a victim of Title VII was eligible only for equitable relief. *See, e.g., Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1239–40 (7th Cir. 1989) (citing *Bohen v. City of East Chicago*, 622 F.Supp. 1234, 1244–45 (N.D.Ind.1985), *aff'd*, 799 F.2d 1180 (7th Cir.1986) (discussing 42 U.S.C. § 2000e–5(g)). However, because equitable relief, such as reinstatement or injunction, was in some cases neither sought by plaintiffs nor was necessarily desirable, Title VII extended no practical relief to a victim of harassment not actually fired. Lacking a judicial remedy, a victim of harassment was deprived full relief under Title VII. Enter the doctrine of constructive discharge. "The constructive discharge doctrine is a judicially-created response to the fact that Title VII, as originally enacted, afforded no damages remedy to a harassment victim for emotional trauma or even for medical expenses she may have incurred." *Chambers*, 17 F.3d at 1005. Constructive discharge became an essential element of the prima facie case for hostile work environment, since without it, there would be no remedial injury, even where a plaintiff could otherwise demonstrate harassment. *See, e.g., Swanson*, 882 F.2d at 1239; *Brooms*, 881 F.2d at 423.

The Civil Rights Act of 1991 amended Title VII to permit a victim of discrimination compensatory and punitive damages. 42 U.S.C. § 2000e–5(g); *Chambers*, 17 F.3d at 1005 n. 1. Thus, whether a plaintiff has been constructively discharged is no longer a relevant question for resolution on a motion for summary judgment, because the court no longer needs to determine whether a plaintiff has suffered an injury for which damages are available.[9] Plaintiffs here have each alleged

---

9. In the recent case, *Vitug*, 88 F.3d at 516–17, the Seventh Circuit considered, and ultimately rejected, an independent claim of constructive discharge claim under Title VII. In assuming that such a claim exists, the court relied on *Saxton. Vitug*, 88 F.3d at 516–17. However, the *Vitug* assumption that an independent constructive discharge claim has survived the 1991 amendments to Title VII, appears inconsistent

that they suffered emotionally and even physically as a consequence of the hostile work environment they endured at Mercury's Southside Branch. *See* Plaintiffs' Ex. B at 7; *see also* Van Jelgerhuis Dep. at 285. All of the discriminatory acts alleged by plaintiffs occurred after November 21, 1991, the effective date of the 1991 Amendments. 42 U.S.C. § 2000e–5. Thus, plaintiffs have made out a prima facie case of a hostile work environment claim which would entitle them to relief under Title VII. *Cf. Russell v. NMB Tech., Inc.,* No. 92–C–6530, 1994 WL 376277, at *4 (N.D.Ill. July 15, 1994) ("Even if we could conclude as a matter of law that [plaintiff] was not constructively discharged, that fact would not entitle the defendants to summary judgment."). Accordingly, Mercury's motion for summary judgment on plaintiffs' Title VII claims is denied.

### D. *Pendent Party Jurisdiction*

■ Although neither party raised the issue in their briefs, it is necessary to consider whether this court has jurisdiction over the state-law claims raised against Johnson, given that summary judgment has been granted to him individually on plaintiffs' Title VII claims.

■ In 1990 Congress amended the supplemental jurisdiction statute to "include claims that involve the joinder or intervention of additional parties." 28 U.S.C. 1367(a) (1990). This amendment effectively overruled the Supreme Court's rulings in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) and *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), narrowing federal court's jurisdiction over so-called "pendent party" claims. Thus, considerations of fairness, judicial economy, and comity guide a court's determination whether to exercise pendent jurisdiction. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *United Mine Workers v.*

*Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The Title VII claims surviving against Mercury are not frivolous, plaintiffs' state law claims against Johnson clearly "derive from a common nucleus of operative facts" as the remaining federal claims, and given that Johnson was the primary actor in the campaign of harassment alleged against plaintiffs, it is fair to say that these claims are paradigmatic of those one "would ordinarily be expected to try … in one judicial proceeding." *Cf. Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138. Thus, it is appropriate for this court to retain pendent jurisdiction over the state law claims averred against Johnson.

### E. *State Law Claims*

#### 1. *Worker's Compensation Act*

Indiana law provides for the "exclusive jurisdiction of the workmen's compensation law, which provides an administrative remedy not litigable in federal court under either the pendent or the diversity jurisdiction of the federal courts." *Guess,* 913 F.2d at 466; *Hurd v. Monsanto Co.,* 908 F.Supp. 604, 609–10 (S.D.Ind.1995).

■ The Worker's Compensation Act excludes all rights and remedies of an employee against her employer for personal injuries where those injuries are: (1) "by accident"; (2) "arising out of employment"; and (3) "arising in the course of employment." *Evans v. Yankeetown Dock Corp.,* 491 N.E.2d 969, 973 (Ind.1986); *Hurd,* 908 F.Supp. at 609–10.

In *National Can Corporation v. Jovanovich,* the court stated that "if an employer intentionally injures an employee, the Act does not apply." 503 N.E.2d 1224, 1232 (Ind. Ct.App.1987); *see also Baker v. Westinghouse Elec. Corp.,* 637 N.E.2d 1271, 1273 (Ind.1994) (holding that the "by accident" requirement definitionally places intentional

---

with the court's reasoning in *Saxton.* 10 F.3d at 536 & n. 22 (discussing constructive discharge solely in terms of relief available to hostile work environment claimant, and noting that the allegedly discriminatory acts pre-dated the 1991 amendments); *see also Chambers,* 17 F.3d at 1005 & n. 1 (noting that the 1991 amendments to

Title VII, by providing a damages remedy, respond to the need previously addressed by the doctrine of constructive discharge). Therefore, because the holding in *Vitug* seems in tension with the rationale in *Saxton,* its cited authority, this court will comply with the more persuasive holdings of *Saxton* and *Chambers.*

torts outside the scope of the Act.). However, the court defined quite specifically the intent requirement necessary "to prevail on a claim of intentional employer misconduct outside the operation of the statute." *National Can,* 503 N.E.2d at 1233.

> While it must be proven that the supervisory employee acted as the alter ego of the corporation or acted upon direct orders from those in control of the corporation, *it must also be proven that the employer had an actual intent to cause the harm complained of* . . . .
>
> 'The mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief of consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classed as an intentional wrong.'

*Id.* (citing *Cunningham v. Aluminum Co. of America, Inc.,* 417 N.E.2d 1186, 1190 (Ind. App.1981) (quoting Prosser, Law of Torts 32 (4th ed. 1971)) (emphasis added). The court held that although plaintiff produced testimony at trial, one, demonstrating his employer's animosity towards him because of his labor activities, two, evidencing his employer's actual desire to force him to quit his job, and three, indicating that abusive work assignments came from "high-level supervisors," plaintiff nonetheless failed to satisfy the "stringent" intent requirements necessary to seek relief from his employer outside of the Workmen's Compensation Act. *National Can,* 503 N.E.2d at 1234; *see also Baker,* 637 N.E.2d at 1274 ("nothing short of deliberate intent to inflict an injury, or actual knowledge that an injury is certain to occur, will suffice.") (endorsing *National Can* intent standard).

■ In addition to this stringent intent standard required to remove a claim from the scope of the Worker's Compensation Act, a plaintiff must also show that the tortfeasor is the "alter ego" of the employer, with control and ownership of the company, or was acting pursuant to an employer policy. *Perry v. Stitzer Buick GMC, Inc.,* 637 N.E.2d 1282, 1287 (Ind.1994).

■ Plaintiffs have alleged claims of invasion of privacy by intrusion into seclusion and intentional infliction of emotional distress against both defendants Johnson and Mercury. However, even drawing all reasonable inferences in favor of plaintiffs, it is clear that they have failed to remove their claims against Mercury from the scope of the Workmen's Compensation Act. Plaintiffs do not allege that Mercury actually intended to injure them. They do not offer any evidence that Johnson was Mercury's alter ego, nor that he was acting pursuant to Mercury policy. Plaintiffs do not even challenge the fact that their injuries arose out of their employment by Mercury or in the course of their employment there. Construing all facts in a light most favorable to plaintiffs, the state law claims against Mercury are within the exclusive province of Indiana's Worker's Compensation Act. *Fields v. Cummins Employees Fed. Credit Union,* 540 N.E.2d 631, 634–35 (Ind.Ct.App.1989) (holding that Worker's Compensation Act was exclusive remedy for state-law claims based on campaign of sexual harassment where plaintiff maintained merely "knowledge"—and not specific intent—on the part of employer). Accordingly, plaintiffs' state law claims against Mercury are dismissed. *Perry v. Stitzer Buick GMC, Inc.,* 637 N.E.2d 1282, 1286 (Ind.1994) (stating that when claims are barred by worker's compensation, proper disposition is dismissal, not summary judgment).

■ Plaintiffs' claims against Johnson, on the other hand, are not within the exclusive ambit of the Worker's Compensation Act. In *Fields,* the court held that although the plaintiff was entitled to workmen's compensation from the employer, tort claims against the employee were not within the scope of the Act. *Fields,* 540 N.E.2d at 635, 638. The court held that it was "inconceivable that acts of sexual harassment or assault could be for the benefit of the employer. Therefore, [the individual defendant's] acts did not arise out of his employment." *Id.* at 638; *see also Baker,* 637 N.E.2d at 1275 n. 6 (stating that if "tortfeasor . . . was not acting in the course of his employment at the time he inflicted the injuries, then he is not considered to be 'in

the same employ' as the sufferer.") (citing *Fields*); *Stump v. Comm'l Union*, 601 N.E.2d 327, 330 n. 3 (Ind.1992) ("An employee may have a separate cause of action against a fellow employee for injuries which arise outside the fellow employee's employment.") (citing *Fields*); *Nelson v. Denkins*, 598 N.E.2d 558, 562 (Ind.Ct.App.1992) (distinguishing work-related disputes from sexual harassment "which clearly has no possible relationship to the performance of employment duties"); *Crowe v. Blum*, 9 F.3d 32, 35 (7th Cir.1993) (noting that Indiana courts "have allowed injured employees to pursue actions against co-workers whose tortious conduct is not 'work-related' even though the conduct at issue occurred during work hours."); *but see Weldy v. Kline*, 616 N.E.2d 398, 402–03 (Ind.Ct.App.1993) (declining to follow *Fields* because it undermines policies underlying exclusive nature of Worker's Compensation Act). Accordingly, because plaintiffs' injuries were not "work-related", their claims against Johnson individually are not barred by the Worker's Compensation Act.

2. *Intrusion Into Seclusion*

■ Indiana recognizes "intrusion into seclusion" as one form of the invasion of privacy tort. *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind.1991); *Watters v. Dinn*, 633 N.E.2d 280, 290 (Ind.Ct.App.1994), *aff'd on other grounds*, 666 N.E.2d 433 (Ind.Ct.App. 1996). "Invasion of privacy by intrusion consists of an intrusion upon the plaintiff's physical solitude or seclusion, either as to his person or to his private affairs or concerns." *Watters*, 633 N.E.2d at 290; *see also Cullison*, 570 N.E.2d at 30 ("When the invasion of a plaintiff's right to privacy takes the form of intrusion, it consists of an intrusion upon the plaintiff's physical solitude or seclusion as by invading his home or conducting an illegal search.").

■ Although the scope of the tort remains somewhat uncertain, there are two cases applying Indiana law that shed light on its range sufficient to find that plaintiffs' contentions, if true, could make Johnson liable on this claim. In *Garus v. Rose Acre Farms, Inc.*, the court, discussing the tort's "undefined parameters", noted that in their treatise, Prosser and Keeton maintain that "highly personal questions or demands by a person in authority may be regarded as an intrusion on psychological solitude or integrity and hence an invasion of privacy." 839 F.Supp. 563, 570 (N.D.Ind.1993) (quoting W. Prosser & J. Keeton, Prosser and Keeton on Torts § 117 (Supp.1988)). The court also noted that the Indiana Supreme Court, in *Cullison*, relied upon Prosser and Keeton in defining the invasion of privacy tort. *Garus*, 839 F.Supp. at 570. In *Moffett v. Gene B. Glick Co., Inc.*, the court held that the tort "consists 'solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.' " 604 F.Supp. 229, 236 (N.D.Ind.1984) (quoting Restatement (Second) of Torts § 652B cmt. a). The court held that the plaintiff successfully stated a claim for intrusion upon seclusion:

> "Because the comments and harassment were based on [plaintiff's] race and her personal relationship with a man of a different race, these intrusions are even more serious and grievous, and as such can be viewed as highly offensive to a reasonable man."

*Moffett*, 604 F.Supp. at 236.

Drawing all reasonable inferences in favor of plaintiffs, Johnson could be found to have invaded their privacy. Although his questions and comments to them occurred in a work environment, plaintiffs' "psychological solitude or integrity" and "private affairs" were intruded upon by Johnson. *Cf. Garus*, 839 F.Supp. at 570; *Moffett*, 604 F.Supp. at 236. Accordingly, Johnson's motion for summary judgment on plaintiffs' claim of intrusion into seclusion must be denied.

3. *Intentional Infliction of Emotional Distress*

■ The Supreme Court of Indiana only recently recognized the tort of intentional infliction of emotional distress. *Cullison*, 570 N.E.2d at 31. The court defined the tort:

[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.

*Id.* (quoting Restatement (Second) of Torts § 46 (1965)). The essence of the tort hinges on the intent requirement. *Cullison,* 570 N.E.2d at 31 ("It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress."); *Watters,* 633 N.E.2d at 292 ("The intent to harm one emotionally forms the basis for this tort."); *see also Shuamber v. Henderson,* 579 N.E.2d 452, 455 (Ind.1991) (characterizing its ruling in *Cullison* as "where intentional torts are concerned, recovery for emotional distress is now permitted in the absence of any physical injury if the tort is one which would *foreseeably* provoke an emotional disturbance of the kind normally to be aroused in the mind of a reasonable person.") (emphasis added).

■ Plaintiffs amply demonstrate that a reasonable trier of fact could infer that Johnson intended to harm them emotionally. There is no apparent legitimate basis for Johnson's treatment of plaintiffs, *cf. Watters,* 633 N.E.2d at 292 (holding that where there was no relevant purpose for which defendant could have referred to plaintiff's health records in legal proceeding genuine issue of material fact existed regarding defendant's intent), and each plaintiff responded affirmatively when questioned whether Johnson intended to hurt them. Van Jelgerhuis Dep. at 281; Brooks Dep. at 92, 94; Nowlin Dep. at 83.[10]

■ Although the crux of the tort is the intent requirement, it is not enough for a plaintiff to demonstrate intent alone; a defendant's conduct must be "extreme and outrageous" for liability to attach. Conduct will satisfy this requirement:

only where [it] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Conwell v. Beatty,* 667 N.E.2d 768, 777 (Ind. Ct.App.1996). Again, drawing all reasonable inferences in favor of plaintiffs, a trier of fact could determine that Johnson's actions towards these plaintiffs was beyond all bounds of decency. As discussed, *supra,* Johnson's questions and acts towards plaintiffs as alleged were not merely unpleasant, but sexually obscene. He persistently commented not only on their physical appearances, but also on how their physical appearances impacted on their sex lives. A reasonable trier of fact could conclude that this behavior was outrageous. Accordingly, Johnson's summary judgment motion on plaintiffs' intentional infliction of emotional distress claim is denied.

## CONCLUSION

For the reasons set forth above, the court finds: (1) plaintiffs' disparate impact and disparate treatment claims are dismissed because they exceed the scope of their EEOC charges; (2) the hostile work environment claims are dismissed against defendant Johnson because he cannot be held individually liable; (3) the state law claims against Mercury are dismissed because the Worker's Compensation statute bars those claims; and (4) genuine issues of fact preclude summary judgment for defendant Mercury on plaintiffs' hostile work environment claim; and (5) plaintiffs' state law claims against Johnson

---

**10.** Defendants maintain that, in her deposition, Nowlin conceded Johnson did not intend to hurt her, and therefore, her claim must fail. (Defendants' Br. at 45–46). In fact, Nowlin initially responded she believed Johnson could have had it in his mind to inflict mental suffering on her. Nowlin Dep. at 83. It was only after defense counsel questioned her about what she was "claiming" that he managed to elicit first, the confused response, "Claiming?" and then, second, an affirmative response to the question regarding intent. *Id.* This court is not satisfied that Nowlin's initial response was sufficiently negated by her subsequent answer such that she should be denied the opportunity to allow a trier

survive the motion for summary judgment.[11]

of fact to gauge Johnson's intent to harm her emotionally.

**11.** For purposes of their summary judgment motion, Defendants proposed to accept plaintiffs' facts as essentially true. Defendants submitted an affidavit of a Mercury employee with their memorandum in support of their motion. This court granted plaintiffs' motion to strike the affi-davit. In their reply memorandum, Defendants move this Court to reconsider its prior order. That motion is denied. Even if considered, the challenged affidavit only raises additional genuine issues of material facts already sufficient to preclude summary judgment on the grounds discussed.